**FREEMAN CONTRACTORS, Inc. v. CENTRAL SURETY & INSURANCE CORP. et al.**

No. 14398.

United States Court of Appeals
Eighth Circuit.

July 2, 1953.

J. Rudolph Hansen, Des Moines, Iowa (Hansen & Wheatcraft, Des Moines, Iowa, on the brief), for appellant.

Herschel G. Langdon, Des Moines, Iowa (Ross H. Sidney and Herrick & Langdon Des Moines, Iowa, on the brief), for appellee, Central Surety & Insurance Corp.

Maxwell A. O'Brien, Des Moines, Iowa (Parrish, Guthrie, Colflesh & O'Brien, Des Moines, Iowa, W. C. Fraser, Hird Stryker, Jr. and Fraser, Connolly, Crofoot & Wenstrand, Omaha, Neb., on the brief), for appellees, Peter Kiewit Sons' Co. and Morrison-Knudsen, Inc.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

Peter Kiewit Sons' Co. and Morrison-Knudsen Company, Inc., hereinafter referred to collectively as Kiewit, entered into a contract with the United States on October 15, 1947, for construction known as Riverdale Townsite Stage II, at Riverdale near Garrison, North Dakota. The contract involved construction at a cost of approximately $7,000,000, including the erection of permanent and temporary housing, and other accommodations to be used by workers engaged in the construction of a dam on the Missouri River. Much of the work, such as painting, plastering, plumbing, and electrical wiring, was sublet to other contractors.

Freeman Contractors, Inc., was employed by Kiewit as sub-contractor for the painting under a written contract dated October 30, 1947. In this contract Freeman Contractors agreed to furnish all materials, labor, and supplies necessary to complete all painting in accordance with the terms and provisions of the contract between the United States and Kiewit, which by reference was made a part of the subcontract, for the total amount "of approximately $120,402." The subcontract contained the following provisions:

"Section 4. The Contractor reserves the right to make changes in materials to be furnished or work to be performed under this Subcontract, or additions thereto or omissions therefrom, upon written order to the Subcontractor.

"Any additions or reductions to be made to or from the amount of the contract price resulting from changes in work or materials furnished shall be agreed upon in writing by the parties hereto, such agreement not being valid unless signed by an officer of the Contractor. In case of disagreement between the parties hereto as to additions or reductions the same shall be determined by the Architect or Engineer by certificate in writing. No addition or reduction in contract price shall be binding upon the Contractor unless agreed upon in writing or determined by the Architect or Engineer as hereinbefore provided for.

"Section 5. The Subcontractor agrees to furnish the materials and/or perform and complete the work called for under the Subcontract within the following time or times, to-wit: As and when required and directed to * * *.

"No allowance of an extension of time, for any cause whatever, shall be claimed by the Subcontractor or be made to him, unless the Subcontractor shall have made written request upon the Contractor for such extension, within forty-eight hours after the cause for such extension occurred, and unless the Contractor and Subcontractor have agreed in writing upon the allowance of additional time to be made. If such extension of time is requested as aforesaid and the Contractor and Sub-

contractor cannot agree thereupon, the Architect or Engineer shall determine by certificate in writing what, if any, extension of time shall be allowed.

\*   \*   \*   \*   \*   \*

"Section 6. The Subcontractor shall furnish all materials, labor, tools, equipment and supplies necessary for the performance of this contract as specifically herein provided, and in a proper, efficient and workmanlike manner. The Subcontractor shall furnish materials and prosecute the work undertaken at the times herein provided for and otherwise in a prompt and diligent manner and so as to promote the general progress of the entire construction, and shall not, by delay or otherwise interfere with or hinder the work of the Contractor, or any other Subcontractor."

The subcontractor was required to furnish at his own expense a satisfactory performance and payment bond executed by a surety acceptable to the contractor.

Central Surety and Insurance Corporation became the surety for Freeman Contractors upon the required performance and payment bond, which was executed on the 12th day of November, 1947, at Des Moines, Iowa, and conditioned upon the faithful performance by Freeman Contractors of all its obligations under the subcontract. This bond was executed by the surety pursuant to a written application signed by Freeman Contractors in which Freeman Contractors agreed in consideration of the execution of the bond to indemnify the surety "against all liability, loss, costs, damage, expenses and attorneys' fees whatever and any and all liability therefor or payments made on account thereof, sustained, incurred or paid by the Corporation by reason or in consequence of the execution of the bond \* \* \*. Liability hereunder shall extend to any and all disbursements made by the Corporation [the surety] in good faith under the belief that it was liable for the amount so disbursed, or that it was necessary or expedient to make such disbursements whether such liability, necessity or expediency existed or not. \* \* \*"

By other provisions of the application Freeman Contractors assigned to the surety all payments due or coming due to it under its subcontract and all its tools, equipment, and material purchased for or used in performance of its contract. On February 7, 1949, Freeman Contractors abandoned work under its subcontract, and on February 23, 1949, Kiewit demanded that the surety complete the work required under the subcontract in accordance with the provisions of the performance and payment bond. At the time of this demand Freeman Contractors had completed about 76 per cent of the work called for by its subcontract.

When the surety advised Freeman Contractors of the demands of Kiewit that the surety complete the work to be done under the subcontract, Freeman Contractors denied that it was in any way liable to Kiewit for further performance under the contract, asserted that Kiewit had breached the contract with Freeman Contractors, and as the result of this breach Kiewit was indebted to Freeman Contractors for damages, and Freeman Contractors was entitled to rescind and had rescinded the contract on which the payment and performance bond was executed. Freeman Contractors demanded that the surety recognize no liability under the payment and performance bond, make no payments to Kiewit, and insisted that any payments so made were voluntary payments for which Freeman Contractors was not liable to the surety.

Following negotiations between all parties in interest, the surety and Kiewit settled Kiewit's claim against the surety on the bond over the protest of Freeman Contractors. At the time of this settlement between Kiewit and the surety the unpaid balance for the completion of the work under Freeman Contractors' subcontract was $32,094.47. Kiewit was of the opinion that the contract would probably be completed for $50,000. The surety paid Kiewit in cash the sum of $17,905.53, the difference between the sum remaining unpaid under the contract and the estimated cost of completion. Kiewit agreed that if the contract was completed for not more than $50,000 it would pay to the surety the sum of $10,-000 in settlement of the subcontractor's

claim against Kiewit for breach of contract; that if the cost of completion exceeded $50,000 it would deduct from the $10,000 all cost over $50,000, withholding for such excess cost all of the $10,000 if necessary. Kiewit expended approximately $66,000 in completing the contract.

In addition to the cash payment of $17,-905.53, the surety agreed to indemnify Kiewit against any loss or expense by reason of any unpaid accounts incurred by the subcontractor in performance of the contract, and to turn over to Kiewit for use in the completion of the contract all the materials, supplies, and equipment belonging to the subcontractor ordered or on hand for use in completion of the contract. The agreement was signed by Kiewit and by the Central Surety and approved and accepted on behalf of Freeman Contractors by a vice-president of the surety acting as attorney in fact for Freeman Contractors.

Following the settlement with Kiewit, Central Surety sued Freeman Contractors on the performance bond. It asked for judgment against Freeman Contractors for its expenditures under its settlement agreement with Kiewit, and for an order of the court confirming Freeman Contractors assignment to Central Surety of all materials, tools, and equipment had or used by Freeman Contractors in the performance of its subcontract, and also confirming the assignment to Central Surety of all claims of Freeman Contractors against Kiewit for payments due or to become due under its subcontract or for damages for the alleged breach of the subcontract.

To this complaint Freeman Contractors filed an answer and counterclaim against Central Surety. It also filed a third party complaint against Kiewit. In its answer Freeman Contractors denied that it had breached its contract with Kiewit; alleged that Kiewit caused Freeman Contractors to suffer great loss in the performance of the subcontract by delaying and interfering with the work under it so as to subject Freeman Contractors to great and unusual expense; that Freeman Contractors nevertheless continued in the performance of the work under the subcontract on the express promise of Kiewit to reimburse it for the

damages caused by Kiewit; that after Freeman Contractors had exhausted its credit in the performance of the subcontract Kiewit repudiated its promise which had induced Freeman Contractors to continue performance until its credit was exhausted; that thereupon Freeman Contractors notified Kiewit of its determination to rescind the subcontract and to hold Kiewit responsible for the reasonable value of the work done in reliance on Kiewit's promise of reimbursement; that Central Surety was promptly advised of the facts above alleged; and that Central Surety was under no liability to Kiewit. Freeman Contractors further alleged that if any expenditures were incurred by Central Surety under its performance bond, they were incurred with full knowledge of the facts, were not made in good faith but over the objection of Freeman Contractors, and were voluntary payments for which Freeman Contractors was not liable.

In its third party complaint against Kiewit, Freeman Contractors alleged that Kiewit was indebted to it because of Kiewit's breach of the subcontract by delays and interferences with the subcontractor's work and upon its promise to reimburse the subcontractor for the additional expense caused by such delays and interferences in the sum of $76,035.03. Against both Central Surety and Kiewit, Freeman Contractors alleged that the purported settlement made between Central Surety and Kiewit under the performance bond was made with full knowledge of the fact that Freeman Contractors was not indebted to Kiewit and that Central Surety was not liable under its performance bond; that the settlement was the result of friendly relations existing between Kiewit and officers of Central Surety and was made without regard to the merits of the claim upon the bond; that the settlement was fraudulent and collusive and made for the purpose of injuring Freeman Contractors and its credit and business and preventing the collection of its claim against Kiewit. Freeman Contractors asked for actual damages of $100,000 and punitive damages in a like amount against both Central Surety and Kiewit.

By an amendment to the counterclaim and third party complaint Freeman Contractors alleged that after it had rescinded its contract and abandoned the work it was induced by Central Surety to lend to it and third party defendants tools, supplies, and equipment belonging to Freeman Contractors then in its possession at Des Moines, Iowa, for use in the prosecution of the work remaining to be done on the contract on the representation that by the loan Central Surety would induce Kiewit to pay to Freeman Contractors its claim under the subcontract; that Central Surety and third party defendants sold or otherwise disposed of the property received under the loan to the damage of Freeman Contractors in the amount of their reasonable value; that because of the fraudulent settlement of Kiewit and Central Surety, Freeman Contractors' credit was destroyed, with the result that it was unable to complete other contracts which it had in progress at the time or to pay its State and Federal taxes as and when due; all to its damage in the amounts stated.

Central Surety and Kiewit answered the counterclaim and third party complaint, denying the material allegations. In addition, Kiewit set up certain provisions of the subcontract and of its contract with the United States in defense of the action of Freeman Contractors against it. Freeman Contractors, replying to Kiewit's answer to the third party complaint against it, asserted that Kiewit's promise to reimburse for expense caused by delays and interferences on the part of Kiewit constituted an oral amendment to the original subcontract and a waiver by Kiewit of the right to rely upon the provisions of that contract or of its contract with the United States. Kiewit, as third party defendants, filed a crossclaim against Central Surety, claiming that in the event a judgment was awarded Freeman Contractors against Kiewit judgment in a like amount should be entered in favor of Kiewit against Central Surety. Central Surety replied to this crossclaim.

From all of the pleadings the following questions were presented to the trial court:

1. Whether Kiewit breached the contract with Freeman Contractors by so de-laying and interfering with its performance that Freeman Contractors was entitled to abandon the work or to maintain an action against Kiewit for damages;

2. Whether, irrespective of the merits of Question No. 1, the controversy between Freeman Contractors and Kiewit was settled by a compromise agreement wherein Kiewit agreed to reimburse Freeman Contractors for losses incurred above the contract price as the result of the alleged delays and interferences in its performance.

These questions are basic and controlling on other dependent issues, among them:

1. Whether on Kiewit's alleged breach of the compromise settlement of the controversy between the parties Freeman Contractors was entitled to maintain an action against Kiewit for the value of the work done in reliance upon it;

2. Whether Central Surety was liable to Kiewit on its performance bond; and, if so,

3. Whether under the contract between principal and surety the payments made by Central Surety in discharge of its liability were made in good faith for a reasonable amount with a correct accounting to Freeman Contractors of the value of the materials and equipment delivered to Kiewit and used in the completion of the contract.

On May 20, 1950, Kiewit applied to the court "for Determination of Legal and Equitable issues before Jury Trial." The record does not show a ruling of the court on this motion. But on April 20, 1951, the District Judge entered an order requiring that the parties present all the evidence in the case to him, that after hearing of the evidence he would submit to a jury at a later trial all questions on which "a jury issue is generated;" all other questions to be decided by the court. A hearing was held before the District Judge in which seven days were devoted to the taking of testimony. At the conclusion of the evidence the District Judge made declarations of law and findings of fact as follows:

"It is the view of the Court that where the parties to a construction contract have made no express provision in regard to delays by the principal contractor or interferences by sub-con-

tractors there will only be implied therein a provision against unusual or extraordinary or uncustomary delays and interferences and that there will not be implied therein a provision creating liability for delays and interferences which might reasonably be expected in the performance of a large governmental construction project upon which a considerable number of subcontractors will be working and which project is at all times subject to change in the plans of construction by the governmental unit involved. * * *

"In the present case it is the view of the Court that, considering the evidence in the same light that it should be viewed in ruling on a motion for a directed verdict in an action at law, the evidence is not such as to justify the submission to a jury the question of the third-party defendants having breached their contract with Freeman Contractors, Inc., by unusual, extraordinary or uncustomary delays or interferences."

Ruling that the above declarations of law and findings of fact were decisive of all issues in the case, except as to the amount of the surety's claim against Freeman Contractors, the judge held that this question presented a matter of accounting cognizable in equity. He found that the surety company had accounted to Freeman Contractors for the reasonable value of all materials and equipment delivered to Kiewit in the completion of the subcontract, and that Central Surety was entitled to judgment against Freeman Contractors. Conforming to these findings judgments were entered against Freeman Contractors on the complaint of Central Surety, and in favor of Central Surety and Kiewit on Freeman Contractors' cross complaint and third party complaint. Freeman Contractors appealed.

In its answer to the complaint of Central Surety, in its third party complaint, and in its cross complaint, Freeman Contractors demanded a jury trial of all issues in the action. The Kiewit motion and the court's order for a hearing before the judge recognized that the action was one for a jury trial. The record does not show that the parties by written stipulation filed with the court or by oral stipulation made in open court and entered in the record consented to a trial by the court sitting without a jury. Nor does it show a finding by the court that the right of trial by jury of some or all of the issues raised by the pleadings did not exist under the Constitution or statutes of the United States, unless it can be said that the court's finding, after hearing all the evidence, that the counterclaim of Freeman Contractors against Central Surety for the reasonable value of its materials and equipment used in the completion of the contract "is a matter of equitable cognizance" is entitled to that interpretation. Giving the court the benefit of whatever doubt there may be upon this question, Freeman Contractors was entitled as of right to a trial by jury on all of the other issues in the case, and this, without regard to whether before the adoption of the Rules some of these questions raised issues on which the parties were not entitled to a jury trial as a matter of right. Rules 38 and 39 of the Federal Rules of Civil Procedure, 28 U.S.C.A.; 5 Moore's Federal Practice, § 39.03; Kelly v. Shamrock Oil & Gas Corporation, 5 Cir., 171 F.2d 909, 911.

■ The procedure adopted by the District Court resulting in the wrongful denial of a jury trial to Freeman Contractors was in direct contravention of the Rules of Civil Procedure. We have held, however, that the erroneous denial of a jury trial is not prejudicial error where under all the evidence there is no issue of fact to submit to a jury. Leimer v. Woods, 8 Cir., 196 F.2d 828, 836. The controlling question on this appeal is, therefore, whether under all the evidence Freeman Contractors was entitled to a jury trial on the basic issues in the case.

■ To sustain the judgments appealed from, it is not sufficient that the court could or should have reached the same result in a jury waived trial. We must consider the evidence in the same manner as if this appeal had been from a judgment on a directed verdict in a jury case. We are not concerned with the credibility of witnesses or with the weight of the evidence. We must

assume as established all the facts that the evidence on behalf of Freeman Contractors and such favorable inferences as may reasonably be drawn from it tend to prove. Or, as is sometimes said, the evidence in support of the claims of Freeman Contractors must be accepted as true for the purpose of determining the correctness of the court's ruling. Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 439; Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844; Mattson v. Central Electric & Gas Co., 8 Cir., 174 F.2d 215; Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497.

■ The Seventh Amendment guarantees the right of jury trial to litigants in the Federal courts. In view of the constitutional guaranty and the mandatory language of Rule 39, appellate courts will not affirm a wrongful denial of a jury trial unless convinced on the record that the trial judge's conclusion as to the sufficiency of the evidence to take the case to the jury was not the result of a resolution of conflicting testimony. Compare Wilkerson v. McCarthy, supra; Leimer v. Woods, supra; City of Morgantown v. Royal Ins. Co., 337 U.S. 254, 258, 69 S.Ct. 1067, 93 L.Ed. 1347.

Since on this appeal we are concerned only with the evidence on behalf of Freeman Contractors, a summary of that evidence will suffice. In a construction contract of the size and extent of the Riverdale project, involving not only the work of the prime contractor, but also many subcontractors employing different crafts, custom and necessity require that the work be planned and executed on a production basis, that is to say, that the work of different crafts proceed in orderly sequence. For example, in a building the foundation must first be constructed, followed by the erection of exterior walls and roof, the installation of exterior trim, such as window frames, cornices, doors, the finishing of the interior, including the work of electricians, plumbers, and plasterers, and the exterior and interior painting, in the order mentioned. The contract of Freeman Contractors expressly provided that the work required would be performed so as not to interfere with the work of the prime contractor or with the work of other subcon-

tractors, and, by implication, we think, that Freeman Contractors' work would be free from interference on the part of the general contractor and other subcontractors. The Riverdale project was planned on this production basis, and the bid of Freeman Contractors was made with that understanding.

It is not seriously denied that the work on the Riverdale project got off to a slow start. For the first six months of the work Freeman Contractors was subject to delays and interferences which increased the cost of the performance of its contract. The evidence of Freeman Contractors was that these delays and interferences were caused by an experiment adopted by Kiewit for his employees called an incentive plan. This plan, which was adopted by Kiewit in the hope of avoiding payments for overtime, made it impossible for Kiewit to employ enough carpenters to keep his construction work ahead of the subcontractors, with the result that Freeman Contractors, although ordered to proceed, was never able to complete its painting in any one building or series of buildings before being ordered to move its crew to another building or location. In work of this character the general contractor is required to furnish heat and electrical power where needed by the subcontractor. Kiewit never supplied the heat necessary to enable Freeman Contractors to do the interior painting according to specifications without delay. The failure to supply electrical power made it necessary for Freeman Contractors to purchase and install an electric generator. Freeman Contractors was ordered to paint exterior trim before its erection in buildings, making it necessary that this work be done by hand instead of by spraying, adding to its cost. Exterior trim could not be exposed to the weather after painting, but sufficient shelter space was not provided by Kiewit.

When Kiewit finally abandoned its so-called incentive plan and procured an adequate number of carpenters to keep ahead of the painters and other subcontractors, it was threatened with the penalty for delay in performance provided in its contract with the United States. To avoid this loss Freeman Contractors, and other subcon-

tractors, whose work interfered with each other's work, were ordered to work on the same buildings at the same time. On occasions Freeman Contractors was required to paint before crafts which should have preceded it had finished their work, with the result that the painting was damaged and Freeman Contractors had to return to the building to repair the damage done by the other crafts. Interferences of one craft in the work of another prevented orderly and economical operations, causing unusual and costly delays.

The Riverdale project was in an area remote from centers of population, the source of skilled mechanics. During the first part of the work, because of the failure of Kiewit and other subcontractors to keep ahead of Freeman Contractors, that company was unable to employ a full crew of competent painters because the work was not available. Those who were employed had to be carried on the payroll when not working to keep them ready for work when work was available. In the final rush to complete the project Freeman Contractors was compelled to employ painters wherever it could find them, whether competent or not, and to greatly increase its payroll for overtime. Work which but for the delays in the first six months of the contract could have been completed during favorable weather in summer was not ready for painting until late in the following winter when weather conditions delayed work and increased the cost.

From the beginning until the abandonment of the work Freeman Contractors complained of delays and interferences with the orderly progress of the painting. Henry Johnson was the superintendent of Kiewit in general charge of the work in the field. The scope of his agency is not shown by the evidence, although it does appear that he signed the contract between Kiewit and the United States for the Riverdale project and the subcontract with Freeman Contractors as attorney in fact of Kiewit. Peter Kiewit had full authority as representative of his company and the Knudsen Company. Johnson admitted that Kiewit's failure to coordinate the work had caused Freeman Contractors unusual and expensive delays for which it was entitled to reimbursement. He assured Freeman that if his company would remain on the job, just compensation would be allowed by Kiewit for the increased expense of operations. From time to time Freeman explained to Johnson that because of the increased cost of the work his credit was exhausted and unless relief was given by Kiewit he would be unable to secure funds with which to complete the contract. On Johnson's advice Freeman prepared an analysis of the work showing the anticipated cost if the work had proceeded in an orderly manner, and the actual cost of the work done. Johnson advised Freeman to present this analysis of the losses sustained to Peter Kiewit. Freeman presented the facts to Peter Kiewit who recognized the merit in Freeman Contractors' claim and promised Freeman that if his company would stay on the job just compensation would be allowed. Freeman in the final conference with Kiewit advised Kiewit that unless just settlement of the claim was made he would be unable to finish the work. Kiewit promised to make a special trip to the scene of operations to investigate the situation with a view to adjustment of Freeman's claim. This investigation was never made. Kiewit refused to allow Freeman Contractors further compensation.

█ We think the evidence on behalf of Freeman Contractors required the trial judge to submit to a jury the basic questions whether Freeman Contractors was subjected to unreasonable delays in the performance of its contract, and whether Kiewit agreed to reimburse Freeman Contractors for the expense caused by these delays. We do not mean to imply that the evidence on behalf of Freeman Contractors on either question was undisputed. On the contrary, the evidence is in sharp dispute. Had these issues been submitted to a jury or to a judge in a jury waived action, the jury verdict or the judge's finding in favor of Kiewit could not be set aside. But the question here is not what a jury verdict or a judge's finding might have been, but whether, as we hold on this record, Freeman Contractors was entitled as of right to have the disputed issues of fact determined by a jury.

On the question whether Kiewit and Freeman Contractors reached a valid oral compromise on the matters in dispute between them the judge made no finding. And since all judgments against Freeman Contractors were made to depend on the court's finding that no unusual delays in or interferences with the work of Freeman Contractors occurred, all of them must be reversed.

Reversed and remanded for a new trial in accordance with this opinion.