BLAKE CONSTRUCTION CO., INC., et al., Appellants,

v.

C. J. COAKLEY CO., INC., Appellee.

C. J. COAKLEY CO., INC., Appellant,

v.

BLAKE CONSTRUCTION CO., INC., et al., Appellees.

Nos. 79–1225, 79–1229.

District of Columbia Court of Appeals.

Argued July 9, 1980.

Decided May 27, 1981.

Robert F. Condon, Washington, D.C., for Blake Const. et al.

Stanley C. Morris, Jr., Washington, D.C., for C. J. Coakley Co. et al.

Before KELLY, KERN and NEBEKER, Associate Judges.

KERN, Associate Judge:

This case is, in essence, a dispute between a subcontractor and a contractor concerning a partially completed subcontract on a major construction project. We affirm the

[1]. Interstitial floors are floors suspended from the main floors and are designed to house the air handling, mechanical, electrical and other

trial court's decision on all issues except the calculation of the award of damages.

Appellees in No. 79–1229 and appellants in No. 79–1225, Blake Construction Co., Inc. (Blake) and U.S. Industries, Inc. (USI), as joint venturers, bid on and were awarded a contract as the general contractor by the United States, Department of the Army, Baltimore District, Corps of Engineers (the government), for the construction of the "New Walter Reed Hospital" in the District of Columbia. Blake was the managing partner of the joint venture. The contract (also referred to as the "prime contract") was entered into on July 28, 1972, in the amount of $102,321,000.

The remaining appellee in No. 79–1229 and appellant in No. 79–1225, the Aetna Casualty and Surety Company (Aetna), executed performance and payment bonds regarding this contract as surety for Blake and USI.

Appellant in No. 79–1229 and appellee in No. 79–1225, C. J. Coakley Co., Inc. (Coakley), is engaged in the business, *inter alia*, of fireproofing structural steel in buildings under construction. Blake had obtained a bid from Coakley, prior to submitting its bid for the prime contract to the government, for $638,500 for the spray fire-proofing work called for under the government's specifications for the Hospital.

After entering into the prime contract with the government, Blake informed Coakley that its initial bid was too high and that work to be performed now included the installation and fireproofing of tubes around hangar rods in the interstitial floors.[1]

After a physical inspection of the job site by its President, Cornelius Coakley, Coakley executed a subcontract with Blake-USI for the fireproofing work on July 9, 1974, in the amount of $570,000.

None of the above facts have been contested by any party in this litigation, which resulted in a trial without a jury and then the instant appeal.

equipment utilized on each main floor of the Hospital.

The trial court, after a lengthy trial, issued Findings of Fact, Conclusions of Law and Order dated November 5, 1979, which, in brief, found Blake, *et al.*, in breach of contract. The trial judge made a number of findings of fact concerning provisions in the various contractual documents involved in this case.

Specification 9K of the prime contract required that the structural steel be fireproofed in accordance with the details contained in the specifications. Specification 9K/6.6 provided:

Ducts, piping or conduit or other suspended equipment that could interfere with the uniform application of the fireproofing material are to be positioned *after* the application of the sprayed fireproofing. [Record at 806; emphasis added.]

Article 1(a) of Coakley's subcontract with Blake-USI expressly incorporated the provisions of Specification 9K of the government specifications in the prime contract. (Record at 806.)

Coakley's subcontract contained a provision, at Article 1(a), that required it to perform in "full and complete accordance" with the "Contract Documents," which included all the specifications and drawings, including addenda thereto, prepared by the architect which form a part of the prime contract. (Record at 806.)

The subcontract also obligated Blake to provide all heat free of charge that was necessary to heat tarpaulin enclosures provided by Coakley. (Record at 817; no subcontract provision cited.)

Blake was obligated to Coakley, if "satisfactory progress is being made in the execution of this contract," to make "partial payments in accordance therewith as payments are made by the Owner [the government] (Subcontract Article 4(a))." (Record at 819.)

In Article 2(b), the subcontract said, "[N]o such delay [caused by reasons beyond the Subcontractor's control] shall give rise *to any right* to the Subcontractor to claim damages therefor from the Contractor." (Record at 816.)

Article 2(a) required Coakley to prosecute its work "in accordance with progress schedules prepared and issued to the Subcontractor by the Contractor" and Article 2(b) provided that the progress schedules might be changed from time to time and afforded the Subcontractor a right to request in writing from the Contractor extensions of time in which to perform under the subcontract. (Record at 815–16.)

Article 23(a) of the Subcontract stated: The Contractor, without in any way invalidating this contract, shall have the right to make contemplated and/or actual changes, additions, and/or omissions in the work, upon written order to the Subcontractor. The Subcontractor shall thereupon promptly submit an itemized estimate of the value of the work involved and shall, if so directed by the Contractor, proceed diligently to prosecute the work so ordered. Upon determination, by the Contractor, of the value of the work involved, the Contractor will issue a Change Order to the Subcontractor, adjusting the contract sum accordingly. (Record 816.)

The trial court also found that fireproofing is a process of spraying a water-saturated mixture of gypsum, vermiculite and other additives onto structural steel, rods and tubes. This substance dries into a soft material which is quite susceptible to abrasion and water damage. The application of fireproofing should be made with spray nozzles at a uniform optimum distance from the structural steel. Interrupted application of the fireproofing causes the material to congeal inside the spray nozzle, which in turn makes the spray nozzle less efficient or inoperable until it is cleaned.

Fireproofing spray that does not adhere to the applied surface falls to the ground and must be removed. Spraying at a greater or less than optimum distance increases the amount of fireproofing that does not adhere, thus increasing both material and clean-up costs. Several applications of fireproofing were generally required to satisfy government requirements. The fireproofing material will dry on the structural steel

at a rate that is determined by the temperature and humidity. (Record at 811, 812 and 817.)

The incorporation of interstitial floors (see note 1, infra), is provided for in the design of the Hospital. Neither Blake nor Coakley had ever had experience with a building which had interstitial floors. The structural steel supports of the interstitial floors were to be fireproofed under the subcontract. Coakley assumed in preparing, at the request of Blake, its revised bid on the subcontract that its workmen could stand on the interstitial floors while applying the fireproofing to certain surfaces. (Record at 805–06 and 318.)

After signing the subcontract with Coakley and in accordance with Article 9(a) of the prime contract, Blake prepared a Critical Path Method work progress and sequence plan (CPM). (Record at 806–08.) The work sequence on the Hospital soon was at considerable variance with that projected by the CPM prepared by Blake. Due to delays in ordering and receiving delivery of structural steel for the Hospital, the entire steel superstructure roof and interstitial floors of the Hospital were not in place at the early stage of construction that had been proposed by Blake in its CPM. (Record at 808–10.) Other trades began their work at earlier stages in the construction process than had been planned on the floors for which the structural steel had been delivered and erected. The installation of pipes, ducts, and electrical conduits and fittings was among the scheduled work on these floors which was accelerated. Some of these were attached to, or near, the structural steel. (Record at 809–10.)

The mingling of the several trades that were simultaneously at work on the floors created work areas crowded with workers and equipment. (Record at 810.) Fireproofing operations had to be scheduled on the basis of the availability of a free work area, which often required Coakley's workers to shift from floor to floor, rather than completing work on a systematic, scheduled, floor by floor basis. (Record at 815.) Because the interstitial floors were not in place, Coakley found it necessary to hire, erect and use scaffolding platforms from which its workers could spray portions of the structural steel. (Record at 813.) Since the roof was missing and hence unable to provide protection from the rain, water that fell directly on completed fireproofing and water which was swept through openings from above damaged such fireproofing. (Record at 816–17.)

Coakley experienced a strike among its workers that lasted approximately three months. (Record at 815.) Various change orders further disrupted Coakley's performance and added to the difficulty and cost of performing under the subcontract. (Record at 818.) The accidents of other subcontractors in striking against sprayed areas with their equipment and the implementation of change orders damaged fireproofing that had already been applied. (Record at 817.) Heat to warm the inside of tarp-enclosed areas was either not provided by Blake when requested or, when provided, the heat sources were themselves often "stolen" by other Blake subcontractors. (Record at 817.)

Coakley advised Blake through letters and by oral representations to Blake's project superintendent from virtually the moment that Coakley began work under the subcontract that its employees were impeded by work conditions from performing under the subcontract as it had expected; and Coakley specifically cited what it felt to be violations on the part of Blake of Specification 9K/6.6 of the prime contract, viz., that the ducts and piping were being installed before the fireproofing. Coakley further asserted that it was incurring costs of performance in excess of those anticipated and that Coakley demanded and expected compensation for these additional costs. These complaints and demands were regularly reiterated throughout Coakley's stay on the work site.

Blake never formally responded to Coakley's letters and protests, although it did advise its subcontractor which was installing ductwork and piping that such installation was interfering with fireproofing and

was contrary to the understanding between Blake and that particular subcontractor. The trial court found no evidence, however, that Blake ever took effective steps to prevent that subcontractor from continuing to install the ductwork and piping in a manner that interfered with the fireproofing of Coakley. (Record at 810–15.)

The trial court further found that change orders affecting Coakley's work were often not transmitted to Coakley, although they were transmitted as a regular work practice to other trades affected. (Record at 818.) Various billing and payment controversies throughout the period in which Coakley attempted to perform under the subcontract resulted in late or reduced payments to Coakley by Blake. (Record at 819–20.) At no time during the course of its active work on the project did Coakley attempt to bill Blake, as part of its monthly billings, for the extra costs that it had incurred due to the various problems on the work site. (Record at 816.) On February 14, 1975, Coakley temporarily suspended work, citing Blake's noncompliance with specification 9K. (Record at 815.)

Coakley was ordered by Blake through a series of letters in May and June 1976 to complete patchwork of the fireproofing that had become unattached from the steel. The government inspector determined that only one-tenth of this "patching" was due to change orders, but Blake would provide no assurance of extra compensation to Coakley for such patchwork. (Record at 817–19.) Upon being directed to perform patchwork, Coakley agreed to patch only those portions of the fireproofing that it believed were its responsibility under the subcontract. By letter dated June 16, 1976, Blake indicated that, because Coakley refused to perform *all* the patching work, Blake would perform the work itself and would make no further payments to Coakley until it ascertained the cost "of performing this patchwork for you."

Coakley responded on June 18, 1976, giving 72 hours' notice that it was suspending all work on the project. In its letter of June 18, 1976, Coakley alleged many instances of Blake's improper conduct in support of its decision to suspend further work on the project. (Record at 818 and 821–22.) Blake responded with a letter of June 28, 1976, stating that Coakley's threat to suspend work was a "material breach of the contract." (Record at 822.)

Thereafter, Coakley did no further work on the project and removed its materials and equipment from the job site except for those of which Blake took possession. Blake completed the fireproofing work itself. (Record at 822.)

Coakley submitted a requisition for payment dated July 14, 1976, after suspending work and filing suit against appellees for $717,072 which included, *inter alia*, charges for equipment rental, repair and maintenance, and scaffolding. (Record at 822–23.)

Coakley has been paid a total of $242,100 under the subcontract, but during the time of its performance on the site, it had billed Blake a gross amount of $377,447. (Record at 822.) By the end of June 1976, when Coakley terminated work on the project, Blake had been paid $359,568.90 by the government for fireproofing. (Record at 820.) Blake subsequently received further payment from the government for fireproofing plus an additional sum of $100,615 for fireproof patching due to changed orders. (Record at 821–22.) The total of the expenditures of both Coakley and Blake clearly exceeded the subcontract price plus the sum paid by the government to Blake for fireproofing after the implementation of change orders. (Record at 819–20 and 822–23.)

The court, in its Conclusions of Law, concluded Blake, *et al.*, were liable (1) for damages for breach of contract in the amount of $255,951.75, and (2) for certain of Coakley's expenses under a theory of goods and services rendered and money due in the amount of $135,347. The latter award was subsumed in the larger award for damages for breach of contract. Prejudgment interest was allowed Coakley at the rate of 6% computed from the date of the breach in 1976.

We note parenthetically and at the outset that, except in the middle of a battlefield, nowhere must men coordinate the movement of other men and all materials in the midst of such chaos and with such limited certainty of present facts and future occurrences as in a huge construction project such as the building of this 100 million dollar hospital. Even the most painstaking planning frequently turns out to be mere conjecture and accommodation to changes must necessarily be of the rough, quick and *ad hoc* sort, analogous to ever-changing commands on the battlefield. Further, it is a difficult task for a court to be able to examine testimony and evidence in the quiet of a courtroom several years later concerning such confusion and then extract from them a determination of precisely when the disorder and constant readjustment, which is to be expected by any subcontractor on a job site, become so extreme, so debilitating and so unreasonable as to constitute a breach of contract between a contractor and a subcontractor. This was the formidable undertaking faced by the trial judge in the instant case and which we now review on the record made by the parties before him.

The trial court determined that Blake did not provide a reasonably clear and convenient work area to Coakley, thus impeding Coakley's work and increasing Coakley's cost of performance (Record at 824); that Blake failed to sequence reasonably the work so as to permit Coakley to perform under the subcontract (Record at 826); and that Blake was remiss in its supervision of its other subcontractors when they were allowed to "steal" space heaters and damage the in-place fireproofing due to Blake's failure to schedule work reasonably (Record at 828–29), thereby breaching implicit provisions of its subcontract with Coakley.

The trial court also determined that Coakley was entitled to an assurance from Blake that Coakley would be compensated for any patching work required due to change orders or the actions of others and when Blake failed to provide this, it thereby breached implicit subcontract conditions.[2]

The trial judge also found that Blake was guilty of several violations of specific provisions in the subcontract. Thus, the trial court stated that Article 1(a) of the subcontract expressly incorporated the provision of Specification 9K of the prime contract. Blake's subcontractor for mechanical work was authorized by a letter from Blake to install pipes, ducts and electrical conduits *in advance* of the fireproofing work. This was in violation of the above subcontract provision and materially interfered with fireproofing operations and deterred Coakley from full performance under its subcontract. (Record at 824).

Blake was also found to be contractually obligated to supply heat to Coakley's work areas and did not, thereby breaching a specific subcontract provision and incurring liability for any extra work necessitated by damage to the fireproofing resulting from a lack of heat. (Record at 828.)

It would appear that the trial judge also found Blake's delay in paying the March 1976 requisition and its failure to pay the April, May and June 1976 requisitions to be specific breaches of the subcontract by Blake. (Record at 830 and 833.) For all other problems of billing and payment, Blake was found to have *not* breached the contract. (Record at 830.)

Since Blake never supplied Coakley with a performance schedule as contemplated by Article 2(a) of the subcontract, the trial judge found Coakley was under no obligation in accordance with Article 2(b) to submit a written request for an extension of time to complete its work. (Record at 827.)

The trial judge also found that Blake's delay in ordering and receiving structural steel did *not* constitute a breach of the subcontract. (Record at 826–27.)

---

**2.** The trial judge found that the letters Blake sent Coakley, instructing it to complete patchwork, were not "written orders" as contemplated by Article 23(a) of the subcontract, which would have constituted assurance to Coakley of payment. (Record at 831–32.)

The trial judge found that Blake's conduct did *not* constitute fraud or otherwise amount to tortious conduct. (Record at 833.)

The trial court found Blake was estopped from denying Coakley's entitlements to those costs for which Coakley billed Blake during the course of performance. However, Blake was *not* estopped from denying claims made by Coakley subsequent to Coakley's discontinuance of work for costs which had been incurred throughout the performance of the subcontract. (Record at 833–34.) Those later claims of Coakley were, at least in part, disallowed by the trial judge. (Record at 822–23 and 834.)

All other claims and counterclaims of Blake, *et al.*, and Coakley, other than those incorporated in the trial judge's findings above, were denied.

Coakley claims on appeal that the trial court erred in denying recovery of all its claims for incurred costs that had not been billed prior to Blake's final breach. Coakley further claims that the trial court erred in the calculation of damages awarded and in failing to award damages (including punitive damages) for tortious conduct by Blake. As to this latter point, Coakley also claims the trial judge erred in denying admission of certain evidence of overbilling the government by Blake which would arguably have corroborated its tort claim of fraud and malicious intentions on the part of Blake.

Blake, *et al.*, argue the trial judge erred in finding a breach on their part of a duty to schedule reasonably the work of Coakley. Blake, *et al.*, further urge that the "no damage for delay" clause (Article 2(b)) of the subcontract absolved them from any claims for damages under the subcontract by Coakley. They further contend that the findings of the trial court are inadequate to support the award of prejudgment interest and that the trial court did not err in holding that Coakley was not entitled to *all* its

added costs as a result of the alleged delays and interference with its work.

We deal first with the primary contention of Blake, *et al.*, on appeal, *viz.*, that the trial court erred in finding them in breach of the subcontract with Coakley on the basis of an implied duty on their part to schedule work reasonably, when the contract was silent on the work sequence in which this complex construction project was to be effected. The subcontract expressly required Coakley to work "as directed" by Blake and excused Blake from liability for delay damages that might be incurred by Coakley. Therefore, Blake, *et al.*, argue that the unambiguous contract terms must prevail over any implied duties on their part to schedule work to suit Coakley's convenience and that Coakley breached the subcontract by refusing to complete the job when ordered to carry out the patching in 1976.

It is well established that there are certain implicit duties between contracting parties, particularly the duty not to prevent performance by the other party. *See* A. L. Corbin, 3 Contracts, § 570 at 346 (1960). In the case of construction contracts, courts have construed those mutual duties in light of the prevailing practices of the trade and out of deference to the inherent uncertainties of the timing and conditions of the actual performance. However, there is a point at which a contracting party exceeds the necessary latitude of discretionary action, even in construction contracts.

▮▮▮ The record of this case is, in our view, replete with evidence that Blake did hinder or prevent Coakley's performance; scheduled the on-site work in an unreasonable sequence;[3] did not provide a job site in suitable condition for Coakley to perform its work; and did not cooperate with Coakley when necessary to assure Coakley's performance. We are persuaded therefore that the trial judge properly concluded upon this record that these acts collectively and individually constituted a breach of im-

---

**3.** The degree to which Blake did or did not follow its CPM, including the installation of interstitial floors, was indicative but not dispositive of the issue of Blake's failure to sequence work reasonably.

plicit conditions for performance by Blake under the subcontract.[4]

Also, it is our view that the trial court correctly concluded that, when Blake failed to assure Coakley that it would be compensated for the additional expenses it had incurred beyond those contemplated in the subcontract, Blake also breached the implicit terms of the subcontract and Coakley acted properly in discontinuing performance under the subcontract. *See John W. Johnson, Inc. v. Basic Construction Co.,* 139 U.S.App.D.C. 85, 90, 429 F.2d 764, 769 (1970). Consequently, we reject Blake's claim on appeal that Coakley breached the subcontract by its cessation of work and withdrawal from the site in 1976.

Also, we must uphold the trial court's findings upon this record that Blake breached explicit provisions of its subcontract with Coakley by permitting the installation of pipes, ducts and electrical conduits in advance of fireproofing so as to violate the subcontract terms and in a manner which interfered with Coakley's performance under the subcontract; by failing to provide heat for Coakley's tarp-enclosed work areas; and by failing to pay Coakley's billings of March through June 1976 in a timely manner.

It is clear on this record that Coakley never acquiesced in any of these breaches by Blake since at every opportunity it protested those breaches, nor was it compelled to discontinue performance at the time of each breach to preserve its right to compensation. *See Lichter v. Mellon-Stuart Co.,*

193 F.Supp. 216 (W.D.Pa.1961), *mot. for new trial den.,* 196 F.Supp. 149, *aff'd,* 305 F.2d 216 (3 Cir. 1962).

Accordingly, we agree with the trial judge's conclusions of law that Blake was in breach of both implicit and explicit provisions of its subcontract with Coakley and that Coakley did not breach its subcontract with Blake.

We are no more persuaded by Coakley than was the trial court, however, that Blake's conduct amounted to tortious fraud, duress and interference. Fraud must be established by clear and convincing evidence which is *not* equally consistent with *either* honesty or deceit. In order to prevail on a claim of fraud, a plaintiff must establish: (1) a false representation (2) in reference to a material fact (3) made with the knowledge of its falsity (4) with the intent to deceive and (5) on which action is taken in reliance upon the representation. Facts which will enable the court to draw an inference of fraud must be alleged, and allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient. *Bennett v. Kiggins,* D.C.App., 377 A.2d 57, 60 (1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978).

There was no basis in the record for permitting the court to presume Blake was engaged in fraudulent deceit of Coakley rather than the alternate, and from the facts more likely, presumption that Blake was disorganized and confused in its efforts to complete a job of such magnitude.[5]

---

4. *See Southern Fireproofing Co. v. R. F. Ball Const. Co., Inc.,* 334 F.2d 122, 126 (8th Cir. 1964); *Freeman Contractors Inc. v. Central Surety and Insurance Corp.,* 205 F.2d 607 (8th Cir. 1953) (regarding the duty to schedule work reasonably); *Steenberg Const. Co. v. Prepakt Concrete Co.,* 381 F.2d 768, 774 (10th Cir. 1967) (regarding the duty to provide a work-site in reasonably suitable condition); and *Kehm Corp. v. United States,* 93 F.Supp. 620, 623 (Ct.Cl.1950); *Lichter v. Mellon-Stuart Co.,* 193 F.Supp. 216, 222–23 (W.D.Pa.1961), *mot. for new trial den.,* 196 F.Supp. 149 (1961), *aff'd,* 305 F.2d 216 (3 Cir. 1962) (regarding the duty of the contractor to cooperate with the subcontractor to assure the latter's performance).

5. The claim by Coakley that there were cost savings realized by another subcontractor when the interstitial floors were *not* in place at an early stage is not persuasive of Blake's deceit to Coakley since neither Blake nor its subcontractors were obligated to avoid cost savings.

Blake's refusal to make payments to Coakley when they were in the midst of a contract dispute does not rise to the level of tortious duress and the trial judge reasonably so found. When two parties are in dispute over performance under a contract, their recourse lies in a *legal suit under the contract and not in an action in tort* unless there are exceptional circumstances of a violation of duty imposed by statute or law beyond the contract's terms.

Blake had no obligation to advise its subcontractors generally about its doubts and fears regarding delivery and scheduling dates prior to entering into its subcontracts. Blake made no factually incorrect statements on these matters nor were there any allegations that Blake affirmatively misled Coakley in any way. Coakley on this record was a company with experience in the construction industry and, in light of Coakley's letter to Blake of May 25, 1976, in which it stated that "Blake Construction is well aware of the grave losses we suffered due to similar job conditions imposed on us by the city of Baltimore Police Headquarters" (Appellant's Brief at 14), the trial court was undoubtedly struck less by Blake's failure to disclose, than by Coakley's failure to ask for, more full and precise data.[6]

Similarly, punitive damages are awarded for breach of contract only where there is an intent to defraud or circumstances of extreme aggravation. *See Minick v. Associates Investment Co.*, 71 U.S. App.D.C. 367, 368, 110 F.2d 267, 268 (1940). The trial judge did not err in deciding that punitive damages were not warranted in this case.

We take up now the question of whether those alleged expenses incurred by Coakley regularly over the period of its performance of the subcontract but which it did *not* bill to Blake until *after* discontinuing work under the subcontract could be contested by Blake in this suit. Blake was estopped by the court from disclaiming an obligation to pay those billings of Coakley, totalling $377,447, made *before* the end of June 1976. The trial judge was correct in concluding that Blake was *not* estopped from challenging the billings submitted by

Coakley subsequent to discontinuing work on the project. While those later billings were for costs incurred during the course of Coakley's performance under the subcontract, Blake had not been informed of their amount with sufficient specificity at the time they were incurred.

Consequently, Blake could and did challenge such claims advanced by Coakley. Such challenge met with mixed success as evidenced by the fact that the judge found that Coakley had billed Blake $377,447 up to the time Coakley discontinued work but in computing damages concluded that Coakley's adjusted cost of performance under the subcontract was $598,666.75. The difference between these two figures must be those additional expenses the trial judge found to be allowable in fixing the ultimate damages. There is sufficient evidence on this record to show that the trial judge did not err in his determination of what were, and were not, allowable expenses incurred by Coakley and for which Blake was liable.

Blake vigorously urges upon us the applicability of the "no damage for delay" clause of the subcontract. However, the trial judge, citing *Housing Authority of the City of Dallas v. Hubbell*, 325 S.W.2d 880, 891 (Tex.Civ.App.1959), stated that such clause "did not give [Blake] a license to cause delays 'willfully' by 'unreasoning action,' 'without due consideration,' and in 'disregard of the rights of the other parties,' nor did the provision grant [Blake] immunity from damages if delays were caused by [it] under such circumstances."

Courts will generally enforce such a clause unless the delay is one "(1) not contemplated by the parties under the [no damage for delay] provision, (2) amounting to an abandonment of the contract, (3)

Certainly in the present case, where two experienced businesses are involved in a large and complex construction project, something more must be presented to support an action in tort than was shown on this record.

6. The trial judge rightly determined that the admission of evidence of alleged fraud by Blake against the government proffered by Coakley at trial would have been irrelevant and an unnecessary digression and properly excluded the

admission of that evidence. Any fraudulent dealings by Blake with the government had no significance in this case except to attack the character of Blake. Coakley may well be advised to seek counsel regarding its legal duty to report fraud against the government when it has firm evidence of such fraud and the legal repercussions of failing to report such fraud when known.

caused by bad faith, or (4) amounting to active interference." *See E. C. Ernst, Inc. v. Manhattan Construction Co. of Texas,* 551 F.2d 1026, 1029 (5th Cir. 1977), *pet. for reh. granted in part and den. in part; pet. for reh. en banc denied,* 559 F.2d 268 (5th Cir. 1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). Determinations of when such delay falls within the above exceptions rests necessarily upon the particular facts of each case.

▮ We deem the trial court to have been correct in determining delays here were *not* contemplated by the parties to the subcontract and resulted from conduct amounting to active interference, largely due to Blake's improper work sequencing. Specifically, we refer to the trial court's findings of Blake's failure, after receiving notice from Coakley, to take effective steps to prevent further installation of pipes, ducts and electrical conduits contrary to the subcontract's terms; to provide heat for tarp-enclosed spaces; to assure that Coakley would have a reasonably clear work area; and to assure that fireproofing in place would not be damaged by other subcontractors or the elements.

We consider now Coakley's claim that the method used by the trial judge to ascertain the measure of damages fails to meet the ultimate test of the fitness of a damage award, which is to make the injured party whole.

▮ The trial judge was faced with the somewhat unusual situation where the contractor breached its subcontract but the cost of performance by the subcontractor would have clearly exceeded the value of the subcontract. A court will not salvage a contracting party from the consequences of

a losing contract, but in this case it is clear from the trial court's findings that the change orders and the mode of performance by Blake significantly amended the subcontract. *See C. F. Bolster Co. v. J. C. Boespflug Construction Co.,* 167 Cal.App.2d 143, 334 P.2d 247 (1959); and *Baccari v. Perini & Sons, Inc.,* 293 Mass. 297, 199 N.E. 912 (1936).[7] Therefore, the subcontract value offered no standard by which to measure an award for damages. Since a comparison of Coakley's original bid ($638,500), and his subsequent amended bid ($570,000), gave no means of calculating an ascertainable profit margin, and in fact seemed to indicate that there was none, the formula for the measure of damages was the cost of work actually performed, less any progress payments Coakley received. *See* J. Calamari and J. Perillo, Contracts (2d ed. 1979) § 14–28 at 559; *Crankshaw v. Stanley Homes, Inc.,* 131 Ga.App. 840, 207 S.E.2d 241, 243 (1974); and Restatement of the Law, Contracts § 333 (1932).[8]

Accordingly, we conclude that the measure of damages to Coakley for which Blake, *et al.,* are liable is properly calculated by taking the cost of partial performance incurred by Coakley, which was $598,666.75, and subtracting therefrom the payment received to date by Coakley from Blake, which totalled $242,100. The difference between these two figures is $356,566.75, and constitutes the damages for which Blake, *et al.,* are liable to Coakley.

We now take up Blake's contention that the trial court erred in awarding Coakley 6% interest on its judgment from the date of the breach in 1976 rather than the date of the judgment entry, which was November 5, 1979. Blake argues that the award of damages to Coakley accrued from an

---

7. The rule that a contractor is not entitled to extra compensation for unforeseen difficulties does not apply here because the wrongful conduct of the other party, Blake, rather than a natural condition, caused the difficulties. *See United States for Use of E. & R. Construction Co., Inc. v. Guy H. James Construction Co.,* 390 F.Supp. 1193 (M.D.Tenn.1972), *aff'd,* 489 F.2d 756 (6th Cir. 1974).

8. Coakley filed his action for recovery under three counts: (I) for damages in tort; (II) for damages for breach of contract; and (III) for what it characterizes as a common law claim for goods and services rendered and money due and what Blake, *et al.,* call *quantum meruit.* Since the measure of these damages is the same under both Coakley's count for breach of contract as well as its claim for goods and services rendered and money due, we need not distinguish between these theories of recovery.

unliquidated debt during the pendency of this litigation and, under D.C.Code 1973, § 15–109, was not susceptible to an additional award of prejudgment interest.

■ The general rule in the District of Columbia is that prejudgment interest in contract cases is *not* favored. *Flanaghan v. Charles H. Tompkins Co.,* 86 U.S.App.D.C. 307, 182 F.2d 92 (1950). Nevertheless, the statute, while permitting an award of interest "from the date of the judgment only," allows an award of prejudgment interest in contract cases "if necessary to fully compensate the plaintiff." [*Id.* at 308, 182 F.2d at 93.]

■ This is normally a matter left to the discretion of the jury or the trial court sitting without a jury. *Dyker Bldg. Co. v. United States,* 86 U.S.App.D.C. 297, 302–03, 182 F.2d 85, 90–91 (1950); *Tendler v. Jaffe,* 92 U.S.App.D.C. 2, 6, 203 F.2d 14, 17, *cert. denied,* 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344 (1953); *Noel v. O'Brien,* D.C.App., 270 A.2d 350 (1970). Although an explicit finding by the trial judge here that the award of prejudgment interest was "necessary" was not made, the award of prejudgment interest in his order implicitly incorporated such a finding. While we would prefer that such findings of necessity be clearly articulated, we are of the opinion that the trial judge did not abuse his discretion in making the award in this case.

*National Trucking & Storage Co. v. Pennsylvania Railroad Co.,* 97 U.S.App.D.C. 52, 228 F.2d 23 (1955), is distinguishable because, in that case, the court said the "factual situation precludes us from construing the base allowance as meeting this [necessary] condition of the statute." [*Id.* at 60, 228 F.2d at 29.] The factual situation in the instant case does not preclude such a construction, given the detailed findings concerning the breach by Blake and the losses suffered by Coakley.

In summary, we sustain all the conclusions of law of the trial court, except that we ascertain damages upon the breach to be $356,566.75, *see* D.C.Code 1973, § 17–306, such sum being the total owing by Blake, *et*

al., to Coakley, with interest thereon computed at 6% annually from June 18, 1976.

*So ordered.*