Betty **GOLDSMITH**, Appellant,

v.

Floriana **TAPPER**, et al., Appellees.

No. 98–CV–520.

District of Columbia Court of Appeals.

Argued March 2, 2000.

Decided April 6, 2000.

---

Kenneth H. Rosenau, Washington, DC, for appellant.

Mayda Colon Tsaknis, Rockville, MD, for appellees.

Before FARRELL, Associate Judge, and GALLAGHER and KING, Senior Judges.

KING, Senior Judge:

Betty Goldsmith seeks reversal of the trial court's grant of a directed verdict in favor of appellees, Busto, *et al.*,[1] on all counts of the complaint against Busto and on a conspiracy to commit fraud claim against Floriana Tapper. Goldsmith contends that the trial court erred in directing the verdicts because she presented sufficient evidence upon which reasonable jurors could have reached a verdict in her favor on those claims. We agree. Therefore, for the reasons set forth below, we reverse.

## I.

In March of 1995, Goldsmith, who was interested in purchasing a club or restaurant in the Washington, D.C. metropolitan area, learned that a restaurant named Floriana's in Northwest, Washington, D.C. was on the market. When Goldsmith visited the restaurant, she spoke to Floriana Tapper, who identified herself as the owner, and who stated that the restaurant was profitable and that she was only selling because of personal family reasons. Goldsmith told Tapper that she was interested

---

1. Luis Busto is an accountant and a partner in Busto & Busto, an accounting firm that performed accounting services for Tapper. Betty Bellido is an employee of Busto & Bus- to. Olga Busto is the wife of Luis Busto, and a partner in Busto & Busto. Hereafter, un- less otherwise indicated, we will refer to all of these parties collectively as Busto.

in purchasing the restaurant with the intent to operate it as both a restaurant and jazz club. Tapper did not inform Goldsmith that live entertainment was prohibited on the premises by District of Columbia zoning regulations and the lease agreement between Tapper and the owner of the building.

Goldsmith requested that Tapper submit financial statements and tax forms for the preceding years in order to assist Goldsmith in determining whether the business was in fact profitable. In late September or early October of 1995, Goldsmith was provided with tax returns for the years 1993 and 1994. It was later determined that these tax returns were fictitious, in that they contained numbers purporting to show income from the business that did not conform to the actual returns filed. The "fake" returns had been delivered to Goldsmith by Tapper in a plain brown envelope. As discussed more fully below, identification of the person or persons responsible for the preparation of the fake tax returns controls the resolution of the issues presented in this appeal. Largely in reliance upon the information contained in the tax returns, Goldsmith decided to purchase the restaurant.

The closing on the purchase of the restaurant took place on November 1, 1995, at Luis Busto's accounting office. Luis Busto was Tapper's accountant and it is undisputed that he prepared Tapper's actual tax returns for the years preceding the sale. While there is a dispute as to the extent of his interest in Tapper's restaurant, it is undisputed that Luis Busto's name appeared on the stock transfer agreement, and that Luis Busto signed the sales agreement transferring the 950 shares of the corporation which he "possessed" to Goldsmith. At trial, Luis Busto asserted that he did not own the 950 shares.

Two months after the purchase of the business, it became apparent to Goldsmith that the income of the business was considerably less than the income reported in the tax returns provided to her prior to the sale. She became suspicious, and with some difficulty, she eventually obtained copies of the actual 1993 and 1994 tax returns from Busto & Busto.[2] Those returns showed actual gross receipts to be at least $300,000 less than indicated on the fake tax returns. Also, the fake tax returns showed that the compensation paid to corporate officers was significantly greater than the compensation reported on the actual returns.

Goldsmith filed this complaint against Tapper and Busto on January 24, 1996 alleging fraud, conspiracy to commit fraud, negligent misrepresentation and breach of contract. At the conclusion of plaintiff's case, defense counsel for Busto moved for a directed verdict. The trial court, while not ruling on the motion, initially indicated that the evidence against Busto was sufficient to go to the jury. However, on the following day, the trial judge granted the motion for a directed verdict on all of the claims against Busto, stating that the evidence was insufficient to show Busto was an owner of the business, that he was involved in the contract for the sale of the business, or that he was responsible for the fake tax returns or any other misrepresentations that may have been made by Tapper to induce Goldsmith to purchase the restaurant. Further, because of the grant of the motion as to Busto, the court also dismissed the conspiracy to commit fraud claim against Tapper because no other person or persons, other than Busto, had been named as a co-conspirator.

The jury reached a verdict in favor of Goldsmith against Tapper on the claims of fraud, negligent misrepresentation and breach of contract, awarding compensatory damages in the amount of $150,600, plus $50,000 in punitive damages. This appeal

---

**2.** The fake returns showed gross incomes of $674,550 and $658,541 for 1993 and 1994 respectively. The real tax returns reported gross income of $374,550 and $323,541 for the same years.

of the grant of Busto's directed verdict and dismissal of the conspiracy claim followed.

## II.

█ The governing rule provides that a directed verdict may be entered if "during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Super. Ct. Civ. R. 50(a)(1). When considering a motion for a directed verdict, the evidence must be viewed in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences to be drawn from the evidence. *Abebe v. Benitez*, 667 A.2d 834, 836 (D.C.1995); *see Washington Metro. Area Transit Auth. v. Jones*, 443 A.2d 45, 49 (D.C.1982) (en banc); *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979). A directed verdict may be granted " '[o]nly where the probative facts are undisputed and where reasonable minds can draw but one inference from them.' " *Aylor v. Intercounty Constr. Corp.*, 127 U.S.App. D.C. 151, 155, 381 F.2d 930, 934 (1967) (quoting *Capital Transit Co. v. Bingman*, 94 U.S.App.D.C. 75, 76, 212 F.2d 241, 242 (1954)). Where "the case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury." *Id.*

█ Applying those principles to the present case, we conclude that there was sufficient evidence presented at trial which, if accepted as true, would permit the jury to find for Goldsmith on all of the claims. "Irrespective of which conclusion a jury might reach, the fact that more than one conclusion, material to the outcome of the case, might reasonably be drawn from the evidence demonstrates that a directed verdict should not have been granted." *Abebe v. Benitez, supra,* 667 A.2d at 836. It was for the jury to determine the credibility of the witnesses and accordingly resolve the factual disputes in the case. Because, in our view, there was sufficient evidence to warrant submission to the jury, Busto's motion for a directed verdict should have been denied.

█ The central claims in this case were the allegations of fraud. The essential elements of fraud are: (1) a false representation; (2) concerning a material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; (5) upon which reliance is placed. *Higgs v. Higgs,* 472 A.2d 875, 876 (D.C.1984) (citing *Blake Constr. Co. v. C.J. Coakley Co.,* 431 A.2d 569, 577 (D.C.1981)). There is no dispute that there was ample evidence to support each of these elements with respect to Tapper. For example, there was testimony that she made numerous false representations of material facts to Goldsmith to induce her to make the purchase. The jury, by its verdict, necessarily credited that testimony.

█ While the evidence with respect to Busto's participation in the misrepresentation is less clear cut, Goldsmith mainly relies on the fake tax returns to supply Busto's connection to the fraud. We agree that the case turns on this issue as to Busto. Indeed, at oral argument counsel for Busto conceded that if this connection were made it would be sufficient to permit the case to go to the jury as to Busto. Therefore, we will closely analyze the testimony presented on that point.

█ Before we address that issue, however, we must examine the extent, if any, and the significance of, Luis Busto's interest in the business, *i.e.,* whether he possessed only a security interest to protect the loan he extended to Tapper or whether he had a defacto ownership interest. The parties do not dispute that Busto held 950 shares, 95% of the outstanding stock of the corporation, either as collateral or as actual ownership interest. Further, Busto signed the sales agreement transferring the 950 shares to Goldsmith during settlement, and the checks which Goldsmith gave to Tapper for the purchase of the restaurant were immediately turned over to Busto, who deposited them into a Busto

& Busto checking account. Moreover, Busto extended substantial financial assistance to Tapper and he was thoroughly interested in the profitability of the restaurant. Although it was hotly disputed whether or not these arrangements established an ownership interest in the restaurant on the part of Luis Busto, we do not consider resolution of that disagreement to be dispositive with respect to the issues presented in this appeal. There is no dispute that Luis Busto possessed some type of interest in the business from which a reasonable jury could infer a motive for wanting to sell the business for a sum equal to or greater than his financial stake.

We will now turn to the evidence regarding the fake tax returns. Both Goldsmith and Tapper provided testimony with respect to the source of the fake tax returns in the manila envelope that was given to Goldsmith by Tapper. Goldsmith testified:

A. They [the financial statements and tax forms for 1993 and 1994] were handed to me in an envelope from Floriana Tapper.

Q. Where did you get this document [1994 fake tax return] from?

A. Floriana Tapper

Q. And was that contained in the envelope that was given to you?

A. Yes, it was.

Later, Tapper was asked:

Q. And did Busto & Busto send down an envelope to you?

A. Yes.

Q. How was that envelope delivered to you?

A. I don't know. I was in the kitchen, and when I come out [sic], Ms. Goldsmith was there and I said to my employee, "Did an envelope come from Busto & Busto?" and one of my employees said, "Yes, the envelope is here. It has been delivered."

Q. So, in essence, there was an envelope that came, and without opening it or examining it, you gave it to Ms. Goldsmith?

A. Yes, I did.

This testimony alone, in our view, provides a sufficient basis for permitting the jury to infer that the fake tax returns originated with Busto. And because the fake tax returns played such a crucial role in inducing Goldsmith to go forward with the purchase, the trial judge erred in directing a verdict on the fraud claims in Busto's favor.

We also note that there was additional circumstantial evidence linking the fake tax returns to Busto. For example, the computer software program used to produce the fake tax forms was the same program as used by the accounting firm. Further, a computer password from Busto & Busto was necessary to retrieve Tapper's tax information from the computer. There was testimony that this password was only known by Ms. Busto. Although our determination that Busto's link to the fake tax returns was sufficiently established by the testimony of Tapper and Goldsmith recited above, these factors strengthen the connection between the fraudulent tax returns and Busto. While Luis Busto denied that he was responsible for the fake returns, there was sufficient evidence to permit a jury to find otherwise. In short, the jury should have been permitted to determine the credibility of the witnesses and make findings accordingly.

■ In sum, viewing the evidence in the light most favorable to Goldsmith, a reasonable jury could infer that the fake tax returns were generated by Busto; therefore the trial judge erred in entering a directed verdict on the fraud and the conspiracy to commit fraud claims. It was also error to direct verdicts in Busto's favor on the breach of contract[3] and negli-

3. Goldsmith's complaint asserts a breach of contract claim based on the failure of Tapper

gent misrepresentation claims.[4] We are satisfied, based on evidence of Busto's interest in the restaurant which could provide him with a motive to convince a prospective buyer that it was prosperous, his involvement in the settlement, and his connection to the fake tax returns, that a jury could infer that Busto had an interest in the restaurant, and a role in the events leading to its sale, sufficient to establish those claims. Finally, because all of the claims against Busto must be reinstated, the dismissal of the conspiracy to commit fraud claim against Tapper must also be set aside.

Accordingly, the order of the trial court directing verdicts against Goldsmith must be reversed.

*So ordered.*

and Busto to provide "the Plaintiff with the proper documentation to implement either the transfer of the license or the assignment of the lease" and the failure to "provide either the lessor of the premises of the building or the Plaintiff with adequate information which would allow the lease to be assigned to the Plaintiff."

4. Goldsmith's complaint asserts a negligent misrepresentation claim based on Tapper and Busto providing her with false information regarding "the revenue produced by the Corporation, the feasibility of the Plaintiff's instituting live music, the transferability of the alcoholic beverage license and the assignability of the lease for the premises of the restaurant."