**U. S. METAL PRODUCTS CO., Inc.,**
**Plaintiff,**

v.

**The UNITED STATES of America,**
**Defendant.**

**No. 68–C–913.**

United States District Court
E. D. New York.

May 27, 1969.

On Application to Reargue July 8, 1969.

Levin & Weintraub, New York City, for plaintiff; H. Stephen Edelman, New York City, of counsel.

Vincent T. McCarthy, U. S. Atty., E. D. New York, for defendant; Cyril Hyman, Asst. U. S. Atty., of counsel.

BARTELS, District Judge.

This action has been instituted under Section 1346(a) (2), 28 U.S.C.A., for the recovery from the Government of $6,237.44, representing the balance due to the plaintiff under a contract with the Government, which has interposed as a defense, an offset in the same amount, claimed to be due the Government under another contract. Plaintiff moves to strike the answer and for summary judgment under Rule 56, Fed.Rules Civ. Proc., 28 U.S.C.A.

There were two contracts between the plaintiff and the Government, the first made on February 9, 1965, and the second on June 28, 1965. The contract upon which this suit is brought is designated as the "Second Contract", but the offset springs from a prior contract, designated as the "First Contract". The offset is the amount of damages caused by plain-

tiff's failure to perform the First Contract after it had filed a petition for an arrangement under Chapter XI of the Bankruptcy Act (Act), which arrangement was subsequently confirmed by the Referee in Bankruptcy. In the arrangement proceeding the defendant did not file a proof of claim for the amount of the offset, which amount plaintiff asserts was a provable claim and was discharged by the confirmation. The pertinent facts may be recited as follows:

(1) On February 9, 1965, plaintiff was awarded the First Contract by the Defense Electronics Supply Center (DESC) through the Defense Supply Agency (DSA) located at Dayton, Ohio, providing for the supply of a number of Jack Boxes to the Government. On June 28, 1965, · plaintiff was awarded the Second Contract by the Department of Navy but was not required to perform thereunder until notice from the defendant, which was not given until March, 1967, after the date the Referee in Bankruptcy had confirmed the arrangement. Performance was completed by May 31, 1968, and final payment made to the plaintiff on that date with notice of defendant's intention to withhold the sum of $6,237.44.

(2) Although the First Contract was awarded in Ohio, plaintiff was advised by the Government on November 1, 1965, that responsibility for administration of the First Contract would be transferred to the Defense Contract Administration Services Region, New York, and that all correspondence relating to the Contract should be directed to the New York office.

(3) The First Contract provided for delivery to the Government of a number of Jack Boxes pursuant to three calls in specified quantities at future times as required by DSA. Call 1 was made on February 10, 1965 and was met by the plaintiff. Call 2, dated November 24, 1965, required delivery beginning January 31, 1966 and ending March 31, 1966. Call 3 was made February 1, 1966 and required delivery on March 1, 1966 to May 31, 1966. As appears in the subsequent paragraphs, the 2nd and 3rd calls were not met and are the subject of this litigation.

(4) On December 15, 1965, plaintiff wrote DESC, Ohio, that due to the failure of its brass supplier, it did not "look possible for us to meet the delivery schedule based upon the promises we have from the brass company."

(5) On February 1, 1966, DESC, Ohio, made a request of plaintiff for delivery on Call 2, which was followed by a letter, dated February 9, 1966, from the Department of Commerce mandating plaintiff's supplier to supply brass to the plaintiff.

(6) On March 17, 1966, plaintiff filed a petition for an arrangement under Chapter XI of the Act and continued the operation of its business. In its schedule of creditors and in its report of executory contracts required by Section 324(1) of the Act (11 U.S.C.A. § 724(1)), plaintiff did not list the United States as a creditor or a party to an executory contract.

(7) Notice of the first meeting of creditors was mailed by the Referee on March 29, 1966, fixing the last day to file claims as October 19, 1966.

(8) Although DESC received no notice of creditors' meeting, plaintiff by letter of March 22, 1966, notified DESC, Ohio, of the filing of the Chapter XI petition, stating that it was required by court order to operate profitably but could not do so at the present contract prices and appealed to the Government for a price increase on Jack Boxes.

(9) On March 29, 1966, DESC denied this request and asked for a reply as to plaintiff's "anticipated future action", to which plaintiff responded on April 7, 1966:

"We believe there is a regulation which does permit an increase in price under certain distress conditions and we respectfully request that you investigate the possibility of an increase in price. In the meantime, as explained above *we are preparing to start manufactur-*

*ing the Jack Boxes in about two weeks."* (Emphasis supplied.)

(10) Eight days later, however, on April 15, 1966, plaintiff wrote DESC, Ohio, that it could not manufacture the Jack Boxes at the contract prices without a loss and petitioned for either one of the following alternatives:

"1. that we be let out of the contract without completing Call 2 or 3; or,

2. that we be given relief under Section 17 of Statute 85–804 [§ 1 of P.L. 85–804] and that the price of the Jack Boxes be increased to $7.08 each which would cover our labor, material and overhead costs only."

(11) On May 26, 1966, the Terminating Contract Officer of the Government at Ohio informed the plaintiff that it was not entitled to a price increase but that the final decision rested with DESC, to whom plaintiff could forward information for a formal determination.

(12) On May 31, 1966, plaintiff requested further information with regard to a price increase but on June 14, 1966, the Government informed the plaintiff that it was considering termination, in response to which plaintiff, on June 15, 1966, requested that "consideration be given to terminating this contract *without prejudice.*" (Emphasis supplied.)

(13) On October 31, 1966, the Government sent plaintiff a notice of immediate termination of the Contract for failure to complete deliveries required by Calls 2 and 3.

(14) On November 4, 1966, plaintiff filed an appeal from the default termination to the Armed Services Board of Contract Appeals (Board).

(15) On December 13, 1966, the Referee in Bankruptcy confirmed the arrangement, thus discharging all provable claims in accordance with the provisions of the Act.

(16) On March 9, 1967, the Board found that plaintiff had no excusable cause for non-performance of Calls 2 and 3 and concluded that the termination was justified.

(17) On April 13, 1967, DSA notified plaintiff that it was liable to the Government for $6,237.44 as excess costs incurred in reprocuring the supplies required by Calls 2 and 3 of the terminated contract.

(18) From the April 13, 1967 assessment plaintiff again appealed to the Board and argued that the claim had been discharged in bankruptcy, but the Board, on August 16, 1967, affirmed the assessment.

Plaintiff contends that the defendant had a provable claim in bankruptcy for the damages arising from a breach of contract, which could have been filed before the order confirming the arrangement in bankruptcy and that the claim was therefore discharged and unavailable as a defensive offset.[1] This contention is based upon two theories: (1) the Government's claim arose out of an anticipatory breach of contract existing at the time the petition was filed and thereafter, or at all events it was a contingent claim at that time which could have been filed as a provable claim at that time pursuant to Section 63a(8) and (9) of the Act (11 U.S.C.A. § 103(a) (8) and (9)) and Section 57d of the Act (11 U.S.C.A. § 93(d)), and (2) upon formal termination of the contract by the Government prior to confirmation, the Government had a claim analogous to the claim of a creditor arising from the rejection of an executory contract by a debtor under Section 313(1) of the Act (11 U.S.C.A. § 713(1)), and was compelled to prove this claim in the arrangement proceeding.

The first theory advanced by plaintiff in support of its contention is fallacious. While the filing of a petition in a straight bankruptcy proceeding may constitute an anticipatory breach

---

1. The set-off provisions of Section 68 of the Act (11 U.S.C.A. § 108) are not applicable to this situation.

of an executory contract, United States v. Brunner, 282 F.2d 535 (10th Cir. 1960), such is not the case upon filing of a petition for an arrangement under Chapter XI of the Act. This is implicit from the very purpose of Chapter XI, which is to permit the debtor to continue the operation of his business under Court supervision. See United States v. National Furniture Company, 348 F.2d 390 (8th Cir. 1965). A party to an executory contract with the debtor has no right to terminate by reason of the filing of the petition and does not have a provable claim until there has been a rejection under Section 313(1), resulting in injury to such party. In re Greenpoint Metallic Bed Co., 113 F.2d 881, 884 (2d Cir. 1940); Collier on Bankruptcy, Vol. 8, ¶ 3.15[10], p. 230 (14th ed.). Further, before the plaintiff requested termination in this case, the logistics of the correspondence between the parties indicated an intention to perform and demonstrated that both parties expected and consented to a delayed performance. For instance, on April 7, 1966, plaintiff stated that it was preparing to manufacture Jack Boxes in two weeks. Again, on April 15, 1966, plaintiff asked for relief under Section 17 of Statute 85–804 [§ 1 of P.L. 85–804] and requested the Government to consent to a price increase. This is not the language of refusal to perform or threatened breach by simply an appeal for relief from loss arising from contemplated performance. The failure to schedule the defendant as a creditor or the holder of an executory contract supports the inference that plaintiff at that time intended and expected to perform. Regardless, however, of plaintiff's intentions, the Government did not have a provable claim upon the filing of the petition.

Turning to plaintiff's second point, it is obvious that after the petition was filed, the only manner in which the defendant could have obtained a provable claim would have been through the rejection route provided by Section 313 (1). A rejection of an executory contract may be accomplished in two ways: (a) pursuant to permission of the Court under Section 313(1), and (b) pursuant to provisions included in the arrangement as authorized by Section 357(2) of the Act (11 U.S.C.A. § 757(2)). In re Greenpoint Metallic Bed Co., supra. When this occurs any person injured by the rejection is deemed a creditor for the purpose of Section 353[2] of the Act (11 U.S.C.A. § 753) and as such is entitled to file a claim and to receive notice of his right to participate in discussions relative to the formulation and acceptance of the plan. By being apprised of the existence of rights under an executory contract, the other creditors are in a more enlightened position to pass judgment upon the feasibility of the plan. In re Grayson-Robinson Stores, Inc., 227 F.Supp. 609 (S.D.N.Y.1964); In re Greenpoint Metallic Bed Co., supra. No rejection was accomplished under the first alternative and there was no provision for rejection in the arrangement under the second alternative. The failure to assume affirmatively an executory contract does not result in the rejection of such a contract since an executory contract may not be tacitly rejected. See In re Greenpoint Metallic Bed Co., supra; Smith v. Hill, 317 F.2d 539 (9th Cir. 1963).

It is relevant to note that a provable claim must exist at the time of the filing of the petition (Zavelo v. Reeves, 227 U.S. 625, 33 S.Ct. 365, 57 L.Ed. 676 (1913)) and if it does not so exist, as in the case of an executory con-

---

2. The pertinent portion of Section 353 reads:

"In case an executory contract shall be rejected pursuant to the provisions of an arrangement or to the permission of the court given in a proceeding under this chapter, or shall have been rejected by a

trustee or a receiver in bankruptcy or receiver in equity in a prior pending proceeding, any person injured by such rejection shall, for the purposes of this chapter and of the arrangement, its acceptance and confirmation, be deemed a creditor."

tract, it can spring into existence by rejection within the time limit for proof of claims or an extension of time which the Referee may provide when the rejection occurs after the time bar (see In re Miracle Mart, Inc., 396 F.2d 62 (2d Cir. 1968)) and thereafter the creditor's claim relates back to the date of the filing (Section 63c). To accomplish this result there must be rejection by the debtor and an opportunity for the creditor to file his claim; otherwise the creditor is placed in the position where he has no provable claim at the time of the filing of the petition, nor an opportunity to file an *ex post facto* claim and thus is excluded from participation in the arrangement without any fault of his own (Section 57n).

■■ On June 6, 1966, the Referee sent a final notice to all scheduled creditors and to all creditors who had proven their claims, calling a hearing upon the confirmation of the plan for October 20, 1966 and reminding all creditors that October 19, 1966 was the last day to file claims. At that time the Government had no claim but on October 31, 1966, when it terminated its contract for plaintiff's failure to complete deliveries required by Calls 2 and 3, it did establish a contingent claim against the plaintiff. It was not fixed because the plaintiff still maintained its right to a termination without prejudice and its right to be excused from performance as manifested by its subsequent appeals to the Board. This contingent claim, while provable under Section 63a(8), could not be filed within the six-month period or any extension granted by the Court under Section 57n, and since it was not filed within the required time, it could not be allowed (Section 57n). Additionally, the claim was unliquidated and even if the Government had filed the claim belatedly pursuant to any authorized judicial extension of time, there is no indication that the claim was "capable of liquidation or of reasonable estimation" without undue delay to the administration of the estate (Section 57d). Under those circumstances, such claim "shall not be

allowed" (Section 57d) and "shall not be deemed provable" (Section 63d). United States v. Brunner, *supra;* United States v. Luther, 225 F.2d 499 (10th Cir. 1955), cert. denied, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956).

No support for plaintiff's position can be found in the case of In re Miracle Mart, Inc., *supra,* where the bankruptcy court, exercising its equitable power, extended the time for filing a general unsecured claim based upon the rejection of an executory contract. The debtor made no effort to bring the Government within the discharge provisions of the Act, either by scheduling it as a creditor or by scheduling the executory contract, or by applying to the bankruptcy court for the rejection of this contract. There was no rejection and no extension of time within which the Government could have filed a claim. Plaintiff placed the Government in an equivocal position by failing to reject the contract and by simultaneously contesting the Government's claim before the Board after the confirmation. By this technique the plaintiff, if it had received a favorable decision, could have escaped any liability to the Government and by the same token, if it had received an adverse decision from the Board, could maintain, as it now does, that the Government's liability was a provable claim and discharged by the bankruptcy proceedings. Plaintiff was apparently willing to take this gamble and, by so doing, forfeited its opportunity of forcing the Government to file a claim after a rejection of the contract. The Government's claim was accordingly not discharged.

■ One final point raised by the Government should be considered and that is its contention that it never had knowledge of the proceeding. Section 17a(3) of the Act (11 U.S.C.A. § 35(a) (3)) excepts from discharge unscheduled debts unless the creditor had notice or actual knowledge of the proceedings. It is conceded that the Government's claim was not scheduled at any time either as an executory contract or as a debt contingent or otherwise, as required by Sections 7a(8) (11 U.S.C.A. § 25(a) (8))

and 324(1) of the Act, or that the Government was notified as required by Section 58e of the Act (11 U.S.C.A. § 94(e)). There was no extension of time granted to the Government to file claims under Section 313(1) and (3), or under Section 57n as authorized by Section 355 of the Act (11 U.S.C.A. § 755). Plaintiff contends that the Government had the requisite knowledge of the proceedings by reason of its correspondence with DESC, Ohio. The question of knowledge of the proceedings under the particular facts of this case is probably academic. However, in order to understand the Government's position, it is necessary to recall that prior to the filing of the petition plaintiff had been notified that all correspondence concerning this particular contract should be directed to the Defense Contract Administration Services Region, New York. The only proper way in which notice of bankruptcy may be given to the United States is by notice to the particular agency to which the debt is owing. Notice to DESC cannot be imputed to the Defense Contract Administration Services Region, New York. United States v. Golenburg, 175 F.Supp. 415 (N.D.Ohio, E.D.1959). Under these circumstances the Government could hardly be charged with notice or knowledge of the proceedings as contemplated by Section 17a(3). *Cf.*, United States v. Yale Transport Corp., 184 F.Supp. 42 (S.D.N.Y.1960), and United States v. Omer, 232 F.Supp. 746 (D. Kansas 1964). While notice to the proper governmental authorities might have resulted in different action on the part of the Government, the gravamen of the Government's position is predicated in reality upon plaintiff's ambiguous conduct during the arrangement proceedings.[3]

For the above reasons, the motion to strike the answer and for summary judgment is denied. This is an order.

---

3. The Government also complained about the absence of notice to the United States Attorney for the Eastern District of New York, where the proceedings were pending, as required by Section 58b(3), fixing the last day for filing objections to a bankrupt's discharge. While this notice was not given, its absence is of little moment here since the Government's claim is not addressed to the bankrupt's discharge.

## ON APPLICATION TO REARGUE

This is an application to reargue the decision of this Court made on May 26, 1969, denying plaintiff's motion to strike the answer and for summary judgment under Rule 56, Fed.Rules Civ.Proc., 28 U.S.C.A. Plaintiff sued for the recovery from the Government of $6,237.44, representing the balance due the plaintiff under the so-called "Second Contract", to which the Government interposed an offset in the same amount allegedly due the Government under the so-called "First Contract" with the Government. While opposing the motion to reargue, the Government takes the opportunity to cross-move for a summary judgment.

On March 17, 1966, plaintiff filed a petition for an arrangement under Chapter XI of the Bankruptcy Act and continued the operation of its business thereunder. It did not schedule the executory "Second Contract" with the Government as required by Section 324(1) of the Act (11 U.S.C.A. § 724(1) ), nor did it list the Government as a creditor in any respect. The Government did not file a proof of claim in the proceeding. The essence of the plaintiff's contention, which, in fact, is nothing more than a repetition of its original argument in another form, is that it had actually, rather than anticipatorily, breached its contract prior to March 17, 1966, by failure to meet the requirements of performance between January 31st and March 31st, 1966, under Call No. 2, and after March 17, 1966, by failure to meet the requirements of performance between March 1st and May 31st, 1966, under Call No. 3. Therefore it claims that the Government's failure to file a proof of claim has barred it from recovery.

Plaintiff has made some inaccurate statements in its brief, such as a claim that the Court found that the plaintiff "was in default" prior to the filing

of the petition, which, however, are immaterial to the resolution of the issue. The difficulty with plaintiff's approach is its failure to distinguish between an unexcused failure to perform under a contract whereby both parties thereafter treat the agreement as dead, and an excused failure to perform under a contract within specified time limits which are waived by the injured party, whereby both parties thereafter treat the agreement as alive and in full force and effect. The first case is a default which gives rise to a provable claim in bankruptcy; the second case is an excused default which does not give rise to a provable claim in bankruptcy.

With respect to Call No. 2, plaintiff relies heavily upon a letter written on April 15, 1966, in which it asks to be let out of the contract or be given relief under Section 17 of Statute 85–804, stating that "We would appreciate receiving your consideration." This letter, of course, was written after March 17, 1966 and, moreover, must be read with plaintiff's prior letter of April 7, 1966, in which it is stated "we are preparing to start manufacturing the Jack Boxes in about two weeks." Under the circumstances, the letter of April 15, 1966 was not a refusal to perform but a plea for permission not to perform without penalty or, in the alternative, the right to make an additional charge if it did perform. On May 26, 1966, the Government informed the plaintiff that it was not entitled to a price increase but that the final decision would rest with the Defense Electronics Supply Center, to which the plaintiff replied on May 31, 1966, requesting a copy of the applicable law "so that we can properly prepare the information required". At this point it is quite obvious that there was no refusal on the part of the plaintiff to perform but an expressed intention to perform at an increased price. While plaintiff had failed to comply on time with the requirements of Call No. 2 and Call No. 3, this failure had been condoned and the delay waived by the Government, which had every reason to believe that plaintiff would perform, predicated upon plaintiff's correspondence and its failure to seek a rejection under § 313(1) of the Act. Failure to perform on time, per se, does not constitute a default when the other party waives the failure and extends the time of performance upon the expectation of receiving a later performance. See 5 Williston on Contracts § 704 (3d ed. 1961); 6 Williston on Contracts § 856 (3d ed. 1962). The injured party, under such circumstances, has an election to declare a default or to accommodate the wrongdoer by extending the time of performance. He cannot be faulted for his failure to declare a default when the wrongdoer has not refused to perform but, on the contrary, has left the impression that he might perform.

The Court clearly understood the facts of the case and, based upon these facts, made the findings and reached the conclusions in its original opinion, to which it now adheres. Since the Government consented to the extension of time of performance under Call No. 2, there was no breach of the contract at the time of the filing of the petition in bankruptcy, and since plaintiff's conduct with respect to the performance of both Calls 2 and 3, after the filing of said petition did not constitute a refusal to perform but an explanation for its delay and a request to perform under different circumstances, there was no obligation on the part of the Government to treat the failure to perform within the time limits as a default although it had a right to do so. Indeed, as late as May 31, 1966, the plaintiff, while requesting the Government to terminate the contract, requested it to do so "without prejudice". Did this mean failure to so terminate would result in performance or refusal to perform? Consequently, it was not until October 31, 1966, that the Government elected to take advantage of the plaintiff's failures to perform on time and terminated the contract. If at any time before such termination the plaintiff had tendererd full performance, the Government would not have been able

to reject. See Brotherhood of Sleeping Car Porters v. Pullman Co., 200 F.2d 160, 164 (7th Cir. 1952); Peterson Steels v. Seidmon, 188 F.2d 193, 195 (7th Cir. 1951); The Sirius Star, Inc. v. Sturgeon Bay Shipbuilding & Dry Dock Co., 196 F.2d 479, 482 (7th Cir. 1952); *cf.*, Zoda v. United States, 180 F.Supp. 419, 148 Ct. Cl. 49, (1960). Plaintiff cannot now take the position that its condoned failure to perform on time constituted a default *ab initio*.

In view of the above observations, there is no necessity to answer plaintiff's additional arguments. As to the cross-motion for a summary judgment, it is impossible for the Court to ascertain the Government's damages without evidence whether the costs and expenditures for the replacements were reasonable and necessary under the circumstances. No evidence has been presented to this Court concerning market price of the new purchases or what steps were taken in mitigation of damages.

Plaintiff's motion for reargument, as well as defendant's cross-motion for summary judgment, is denied, and the Court's original opinion is adhered to. This is an order.