In the Matter of: VECCO CONSTRUCTION INDUSTRIES, INC., Debtor.

VECCO CONSTRUCTION INDUSTRIES, INC.

v.

CENTURY CONSTRUCTION COMPANY OF WASHINGTON, D.C., INC.

No. 79–224–A.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

June 21, 1983.

Stanley J. Samorajczyk, Hazel, Beckhorn & Hanes, Fairfax, Va., for debtor.

Jack Rephan, Braude, Margulies, Sacks & Rephan, Chartered, Fairfax, Va., Special Counsel for debtor.

Craig B. Dunbar, Gregory J. Miner, Rhodes, Dunbar & Lomax, Chartered, P.C., Arlington, Va., for defendant.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

This case arises from a dispute between a general contractor and a concrete subcontractor over the dismissal of the subcontrac-

tor. At issue are the propriety of the termination and the amount and value of the work performed by the subcontractor.

The plaintiff, Vecco Construction Industries, Inc. ("Vecco"), was the concrete subcontractor and the defendant, Century Construction Company of Washington, D.C., Inc. ("Century"), the general contractor on a project known as The Flour Mill in Washington, D.C. Vecco began work on October 23, 1978, pursuant to oral notice from Century to proceed. On January 12, 1979, the parties executed a written contract which is dated December 8, 1978. Century terminated Vecco on April 27, 1979 before Vecco had completed its work on the project.

On March 14, 1979, approximately six weeks prior to the termination, Vecco had filed a Chapter XI reorganization proceeding in this Court. Century eventually filed a proof of claim in Vecco's Chapter XI proceeding in a final amended amount of $3,721,579.89 which Century attributed to concrete cost overruns and delay damages caused by Vecco. Vecco objected to the claim and filed a counterclaim amended in amount during this proceeding to $440,-767.30, which Vecco asserts is due under its contract and for its materials not returned from the job site. Prior to trial, this Court granted summary judgment against Century on the concrete cost overruns and delay damages issues based upon the fact that Century had been reimbursed by the owner for the concrete cost overruns and has not yet suffered a judgment or otherwise paid any delay damages.[1]

Vecco argues that its termination was improper because Century failed to give seven days written notice of the termination, as required by the contract, and that Vecco had cured any default involving manpower shortage prior to termination. In addition, Vecco argues that Century had materially breached the contract prior to terminating Vecco by failing to pay Vecco's requisitions as they become due and, therefore, could not demand adherence to the terms of the contract by Vecco.

1. *Matter of Vecco Construction Industries, Inc.,* 19 B.R. 69 (Bkrtcy.E.D.Va.1982).

Century argues that Vecco failed to maintain the mutually-agreed work schedule or provide adequate manpower for the job, and that Vecco had become "insolvent" by the time of the filing for relief under Chapter XI, any of which defaults could trigger Century's right to terminate if not cured within seven days following written notice of the default. Century next contends that Vecco over-billed for its work and billed in a manner at variance with the contract.

It is Century's position that Vecco waived any automatic right to payment by the tenth of the month by accepting varying terms, including direct funding of Vecco's payroll by Century. In addition, Century argues that any one of several documents, beginning with a December 28, 1978 telegram demanding more Vecco workers, satisfied the requirement of written notice and gave Century the right to terminate after seven days if the condition had not been remedied.

Vecco contends that Century's failure to pay Vecco's requisitions promptly, according to the terms of the contract, was a material breach of that contract which prevents any subsequent breach by Vecco from being asserted as a ground for termination. Vecco's requisitions were due to Century by the twenty-fifth of the month in which the work was performed. Under the original draft of the Vecco-Century contract, Century's payments to Vecco would not have been due until five days after Century received payment from the owner. Vecco requested and Century agreed to an alteration of this provision that made payments to Vecco due no later than the tenth day of the month following submission of the requisition.

It is Vecco's position that the contract, as altered and ultimately executed, creates in Vecco an unconditional right to payment on the tenth day of the month following presentation of the requisition. In support, Vecco cites *United States v. Curtis T. Bed-*

*well & Sons, Inc.,* 506 F.Supp. 1324, 1327 (E.D.Pa.1981), and *United States v. Community Science Technology, Inc.,* 574 F.2d 1292, 1295 n. 3 (5th Cir.1978). Vecco asserts further that any delay by Vecco in submitting a requisition should be disregarded because Century, in fact, included Vecco's requisition amount in Century's own requisitions to the owner. Lastly, Vecco argues that Century is estopped from challenging the amounts of the requisitions because Century always billed the owner an amount equal to or greater than that billed by Vecco.[2] *Zulla Steel, Inc. v. A.M. Gregos, Inc.,* 174 N.J.Super. 124, 415 A.2d 1183 (N.J. Super. A.D.1980); *Blake Construction Co., Inc. v. C.J. Coakley Co., Inc.,* 431 A.2d 569 (D.C.App.1981).

Century notes that Vecco began work and submitted two requisitions before the parties executed the written contract. In fact, Vecco worked on the job for approximately six weeks before even a draft contract was prepared. Thus, Century argues that the first two Vecco requisitions were submitted without any agreed terms or time for payment and, therefore, payment was due in a reasonable time and in an amount approved by Century. In addition, Century argues that Vecco waived any prior default by Century regarding payment when Vecco obtained the agreement of Century to fund Vecco's weekly payroll and make direct payments to Vecco's suppliers, beginning in mid-March of 1979.

■ Failure of a prime contractor to make progress payments as due to subcontractors is a material breach of the contract. *Bedwell, Community Science* and *Zulla, supra.* Corbin, in *Contracts,* § 754, however, states that conduct by one party which leads the other reasonably to believe that "performance on time will not be insisted on will operate as a waiver of the time condition, as to subsequent defaults as well as antecedent ones." Corbin, *Contracts* (1 Vol. ed.) § 754 (1952). Century argues that this rule operates to excuse its

---

**2.** Although a prime contractor normally will mark up a subcontractor's requisitions to cover the prime's overhead and profit, in this case

Century testified that it was working for a fixed fee.

late payments, especially in light of the later Vecco-Century agreement for Century to fund Vecco's payroll and pay Vecco's suppliers. The same rule and agreement to modify the payment terms, however, would operate also to excuse Vecco's late requisitions. Nothing in the rule would excuse Century's failure to make full payment. Accordingly, the Court finds that Century breached the contract by failing to pay in full Vecco's January and February 1979 requisitions according to the terms of the contract, which by then had been executed.

Century contends that Vecco breached the contract by failing to adhere to the mutually agreed completion schedule. Century also contends that Vecco failed to put enough men on the job and attributes Vecco's inability to maintain the construction schedule to its under-manning of the project. Both "failures" would be defaults under the Century-Vecco contract and would permit Century to exercise its right to give seven days written notice of termination.

The chief executive officer of Vecco, Raymond P. Curry, however, testified that Vecco never agreed to any completion schedule. He testified further that he had given Century an estimate of thirty weeks for the job but that this estimate was based upon "uninterrupted access" to the job site, a condition that was not present at The Flour Mill until excavation of the site was complete in early April 1979.

Regarding Century's assertions that Vecco delayed the job by inadequately manning the project, Curry testified that when Vecco began work the general excavation of the site was not complete and excavation for the footings had not begun. He testified further that problems arose over the installation of the underground plumbing and that Century's inability to resolve those, along with its slowness in getting the footings excavated made it impractical for Vecco to assign many carpenters, rodmen and supervisors to the job. Curry stated that Vecco was never threatened with termination. He stated further that his investigation after receiving Century's December 28,

1978 telegram demanding more Vecco workers indicated that Century really wanted more laborers to perform hand excavation of rock, an "extra" which Vecco was performing on a "time and materials" basis outside the contract.

Vecco's superintendent, who came to the job in January 1979, testified that Century promised more excavating equipment and, later, more pumps when the Potomac river flooded the job site. However, Century did not provide the equipment, thus delaying Vecco still further. Both witnesses stated that the last footings to be excavated and made ready for pouring were those at the center of the building and thus crucial to overall job progress.

Documents in evidence support Vecco's testimony that it had a full crew of workers on the job in the final week before termination and thus had cured any prior default of undermanning. Vecco's officials testified that Vecco always had as many men at The Flour Mill as could be justified by the progress of the excavation and plumbing work which had to be completed before the forming of the concrete.

This testimony by Vecco is not uncontradicted. The evidence adduced by Century on these issues was, however, general and often vague. Vecco's witnesses, by contrast gave specific, detailed testimony regarding the excavation, plumbing and water problems at the site, all of which impeded Vecco's ability to proceed and all of which were Century's responsibility to correct.

Century admits that Vecco had a full crew during its last week on the job and, thus, had cured the undermanning problem. In addition, if Century in fact had been ready for Vecco to work on concrete in November or December, Century would not have waited until the end of April to terminate because of undermanning. It is well settled that party to a contract is under a duty not to prevent performance by the other party. There is much evidence tending to show that Century "interfered" with Vecco's ability to perform by not having the site ready. In *Blake Construction Co., Inc. v. C.J. Coakley*

*Co., Inc., supra,* the D.C. Court noted that there is some latitude given for construction contracts due to the uncertainties inherent to the construction industry. Century's conduct, while perhaps not intentional, nevertheless hindered Vecco's performance. Therefore, the evidence as a whole does not support a finding that Vecco breached the contract by failing to complete the job on schedule or by undermanning the job or that Century had a right to terminate Vecco on that basis. Rather, the Court finds that Century's own conduct excused Vecco from liability for breach by delay. *See,* 17 Am.Jur.2d, *Contracts,* § 389 (1964).

Century next contends that Vecco became insolvent on or before the filing of its Chapter XI petition on March 14, 1979, a fact which, if true, would trigger in Century the right to give Vecco seven days written notice of termination. Since Vecco would be unable to cure insolvency within the seven days before the termination would become effective, insolvency would be an "incurable" default by Vecco.

Century supports its argument with Vecco's petition for relief in which Vecco stated that it was "unable to pay its debts as they mature". Century then matches this statement with the definition of "insolvent" in the Virginia and District of Columbia statutes. These statutes, which comprise each jurisdiction's enactment of the Uniform Commercial Code, state that a person is insolvent if he is unable to pay his debts as they come due. In addition, Century cites the case of *Finn v. Meighan,* 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624, (1945), in which the U.S. Supreme Court held enforceable in a Chapter XI proceeding a lease covenant stating that the lease would terminate if the tenant were "adjudged bankrupt or insolvent by any Court". In the *Finn* case, the Supreme Court ruled further that the voluntary filing of a Chapter XI petition to reorganize, alleging inability to pay debts as they mature, satisfied the lease requirement of being "adjudged bankrupt or insolvent" and caused termination of the lease when the right to terminate arose out of an "express covenant" in the existing contract

between the parties. *Id.* at 303, 65 S.Ct. at 1149.

Vecco argues that the mere filing of a petition for Chapter XI reorganization does not constitute "insolvency" under federal bankruptcy law, so that the right to terminate would not be triggered. In support, Vecco cites *U.S. Metal Products Co., Inc. v. United States,* 302 F.Supp. 1263 (E.D.N.Y. 1969), in which the District Court stated that a "party to an executory contract with the debtor has no right to terminate by reason of the filing of the petition." *Id.* at 1268.

Vecco filed its petition on March 14, 1979, prior to the effective date of the current Bankruptcy Code. Accordingly, all proceedings in this case are governed by the Bankruptcy Act of 1898 (the "Act"). Section 70b of the Act prohibited the enforcement against a trustee (or debtor-in-possession) of a "general covenant or condition" in a lease but specifically stated that "an express covenant that . . . the bankruptcy . . . of either party shall terminate the lease or give the other party an election to terminate . . . is enforceable." (Bankruptcy Act of 1898, § 70b). By analogy, this provision would apply to any executory contract.

In *Schokbeton Industries, Inc. v. Schokbeton Products Corp.,* 466 F.2d 171 (5th Cir.1972), cited by Century, the court enforced termination of an exclusive license based on other defaults by the debtor even in the absence of an express bankruptcy covenant. In *U.S. Metal Products Co. v. United States, supra,* cited by Vecco, however, the court merely stated in dicta that a Chapter XI filing does not constitute an anticipatory breach of an executory contract (although a filing of a straight bankruptcy may do so). The other party, therefore, would not be entitled to cease performing, based solely on the Chapter XI filing, without liability for damages. There was in *Metal Products,* moreover, no indication that the contract at issue contained a bankruptcy termination provision.

 It is clear that the contract between Century and Vecco contained an "ex-

press covenant" giving Century the right to terminate in the event of insolvency on the part of Vecco. It is equally clear that the provision is enforceable against Vecco under the applicable federal bankruptcy statute, which is the Act. In addition, as *Finn v. Meighan, supra,* makes clear, the statement that the debtor "is unable to pay its debts as they mature" which is required for a Chapter XI filing, fulfills the requisite of insolvency and triggers such automatic termination clauses. Thus, Vecco's filing of its voluntary reorganization petition placed it in default of its contract with Century. Moreover, the default was "incurable" because it could not be overcome in seven days. Accordingly, Century would have been within its rights to terminate Vecco on the basis that Vecco had become insolvent by March 14, 1979.

Regarding the insolvency issue, Vecco argues that Century waived any right it may have had to terminate the contract based on Vecco's insolvency by failing to act from March 14, 1979 until April 27, 1979. Vecco further argues that during that time it relied on: (1) the negotiations between the parties over the terms of a Supplemental Agreement whereby Vecco would complete its work and Century would forbear from termination, and (2) the commencement of such measures as Century's direct payment of Vecco suppliers and weekly funding of Vecco's payroll, as indications that Century had no plans to terminate.

In support, Vecco cites *DeVito v. United States,* 413 F.2d 1147, 1154 (Ct.Cl.1969) in which the court set forth a standard for determining whether a party had waived its grounds for termination any failing to act with sufficient promptness. In that case the court stated:

> The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the [terminating party's] knowledge and express or implied consent.

413 F.2d at 1154.

■ Century disavows any waiver based on the elapsing of 42 days between the filing of the petition and termination. In support, Century cites *United States v. Curtis T. Bedwell & Sons, Inc.,* 506 F.Supp. 1324 (E.D.Pa.1981), in which the court held that the prime contractor had not waived its right to declare the subcontractor in default merely because 27 days had passed after the subcontractor filed Chapter XI. The Court in *Bedwell* indicated, however, that reliance by the subcontractor is an important factor which could change the result. If the subcontractor has been misled and has purchased materials, tools or supplies in reliance upon the inaction of the prime contractor, the consequent prejudice should be considered. *Id.* Virginia law looks to the nature of the contract. If a contract requires a "continuing" performance, a party with a contractual right to terminate will not lose the right if he fails to exercise it immediately. *Tiedman v. American Pigment Corporation,* 253 F.2d 803 (4th Cir.1958). However, maintenance of the right may depend upon whether the non-defaulting party "brings home to the promisor the complaints ... [and] continues the relationship on the assurance of better future performance." *Id.* at 807.

■ The evidence here supports a ruling that Century misled Vecco by initiating the proposed Supplemental Agreement, funding payroll, and paying suppliers, all actions aimed at assisting Vecco to stay on the job. These actions of Century, rather than the mere passage of time, indicate waiver by Century of Vecco's insolvency.

Finally, Vecco argues that even if Century's right to terminate were unassailable, Century failed to comply with the seven-day notice provision of the contract. In support, Vecco cites a line of cases which identify default termination provisions as a species of forfeiture and, therefore, to be strictly construed. *Kisco Co., Inc. v. United States,* 610 F.2d 742, 750 (Ct.Cl.1979); *DeVito v. United States,* 413 F.2d 1147, 1153,

(Ct.Cl.1969); *J.D. Hedin Construction Co. v. United States,* 408 F.2d 424, 431, (Ct.Cl. 1969).

Century relies on paragraph 7(f) of the contract as providing Century's right to terminate Vecco. Paragraph 7(f) states, in pertinent part:

> (f) Should the Contractor [Vecco] become insolvent or at any time refuse or neglect to supply a sufficiency of properly skilled workmen, equipment or materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence . . . and if, after 7 days written notice from the Construction Manager [Century] the Contractor shall have failed to remedy the condition, the Construction Manager shall be at liberty . . . to terminate the employment of the Contractor. . . .

Vecco admits that this language means only that Century was required to give Vecco seven-days written notice of the condition justifying the termination and an opportunity to remedy that condition before Century could properly terminate the contract. Vecco does not contend that the words "termination" or "default" had to be used for the notice to be valid.

Vecco argues that the telegram which was sent by Century late Friday afternoon, April 27, 1979, did not give the required seven-day notice of the termination which was effected by Century the following day. The telegram itself states that it is a notice and that "we will undertake your work", without stating a time when the takeover would occur, giving rise to the argument on Vecco's part. However, Century does not rely on this telegram for purposes of the required notice.

Century contends that the following documents sent to Vecco fulfill the requirement of written notice: the December 28, 1978 telegram demanding more manpower, the draft Supplemental Agreement, and the progress meeting minutes of April 6 and 13, 1979. Century also states that Vecco's insolvency could not be cured, a statement which implies an argument that the written notice was, therefore, not required. Such a view is, however, contrary to the case law on the subject. *Bailey Specialized Buildings, Inc. v. United States,* 404 F.2d 355, 363 (Ct.Cl.1968).

The December 28, 1978 telegram on which Century relies stated a demand for more men. Under Paragraph 7(f) of the contract, failure to provide sufficient workmen is a default. Vecco notes that Century admits Vecco cured this default during its final week on the job. Paragraph 7(f), however, gives Vecco seven days to cure, and Vecco's final week on the job occurred four months after receipt of the telegram. Testimony adduced at trial undermines Century's implied argument that it had the right to terminate Vecco for undermanning anytime following the elapse of seven days from Vecco's receipt of the December telegram. That testimony tended to prove that Century had not completed the excavation and plumbing work necessary before Vecco could proceed. Thus, the evidence viewed as a whole shows that Century would not have been warranted in terminating Vecco in early January, seven days after the first telegram. Since Century did not act promptly and admits that Vecco provided a full crew during its final week, equity considerations work against a finding that the termination was justified based on a manpower default. This is particularly so in light of Century's having funded Vecco's payroll in the interim.

Century next argues that the Supplemental Agreement, drafted by Century following negotiations with Vecco after the Chapter XI filing, fulfills the notice requirement. The Supplemental Agreement recites Vecco's insolvency and Century's right to terminate. The agreement then states that Vecco wishes to stay on the job, and Century agrees to forbear the exercise of its contractual rights in the interest of avoiding the increased costs of replacing Vecco. The draft agreement also contains details regarding actions by Century to assure Vecco's performance and promises by Vecco to man the job adequately.

Vecco argues that Century's statement of forbearance precludes any interpretation of

the Supplemental Agreement as the notice required by paragraph 7(f) of the contract.

Century contends further that the minutes of progress meetings held April 6 and April 13, 1979 satisfy the seven-day written notice requirement of the contract. The April 6 minutes contain a statement from Vecco that it "anticipated" having forty carpenters on the job by April 13 but no mention by Century of the existence of any default condition. The April 13 minutes contain a statement by the owner (not Century) that it was dissatisfied with the number of Vecco's men on the job. This, however, is the manpower default which Century admits was cured during Vecco's last week on the job.

■ Accordingly, the Court finds that Century complied initially with the notice provision of paragraph 7(f) of the contract when it sent to Vecco the December 28, 1978 telegram demanding more men on the job. The purpose of notice, however, is to alert the other party to the possibility of imminent termination. When Century did not terminate Vecco promptly thereafter but, rather, funded Vecco's payroll, paid Vecco's suppliers and proposed a Supplemental Agreement in which Century stated its willingness to forbear exercising its contractual right to terminate, it acted in contradiction of the notice the December 28 telegram was intended to give. By those actions, Century misled Vecco for four months. Since Century also admits that Vecco, in fact, had cured any manpower default by the time termination occurred, the Court cannot find that Century observed the notice requirements of the contract on the basis of the December 28 telegram.

■ In addition, neither the draft Supplemental Agreement nor the April 6 and April 13 progress meeting minutes meets the notice requirements of the contract. The Supplemental Agreement recites the condition warranting termination, but the document as a whole speaks clearly to a purpose of keeping Vecco on the job. The April 6 minutes make no mention of any default and the April 13 minutes mention only the owner's dissatisfaction over manpower, a condition Vecco corrected within the seven days permitted for curing under the contract. Therefore, the Court finds that Century failed to observe the notice requirements of the contract before terminating Vecco on April 27, 1979.

Century's president, Edward M. Crough, Jr., admitted in court that the reason Century terminated Vecco was its failure to sign the Supplemental Agreement. In a post-trial brief, Century states that Vecco's continuing insolvency default justified this action. Vecco received written notice of the insolvency default when Century transmitted the draft of the Supplemental Agreement to Vecco's attorney in late March 1979. As previously noted, however, the focus of the draft agreement was assisting Vecco to remain on the job despite insolvency. Thus, this document on which Vecco reasonably relied to ascertain Century's intentions, cannot serve as the notice required by paragraph 7(f) of the contract. In addition, Century never told Vecco of its decision to terminate if Vecco failed to sign the agreement on April 27, 1979. Rather, testimony adduced at trial showed that Century's attorneys again misled Vecco by attending a meeting between Vecco and the owners and then appearing to acquiesce to the owner's directive to work out an amended agreement which Vecco could present to the bankruptcy court for approval.

■ Accordingly, the Court finds that the conduct of the parties throughout Vecco's months at The Flour Mill amounted to mutual breaches of the contract combined with mutual waivers of strict performance. In such case, neither party has a claim against the other.[3] Century, however, ultimately terminated Vecco without prior notice for failing to sign the proposed Supple-

---

**3.** *District of Columbia v. Camden Iron Works,* 181 U.S. 453, 21 S.Ct. 680, 45 L.Ed. 948 (1901);

17 Am.Jur.2d, *Contracts* § 390 (1964).

mental Agreement. Termination for this reason and summarily carried out was improper and amounted to a new, unwaivable breach by Century and for which Vecco is entitled to prove its damages.

■ Section 346(2) of the *Restatement of Contracts,* sets forth the alternate methods by which Vecco may prove its damages as follows:

> (a) the entire contract price ... less instalments already paid and the cost of completion that the builder can reasonably save by not completing the work; or
>
> (b) the amount of his expenditure in part performance of the contract....

*Restatement of Contracts* § 346(2)(a)-(b) (1932). The *Restatement, 2d* similarly provides that the injured party may recover his "expectation interest" (including lost profits) or, alternatively, his "reliance interest" based upon expenditures made in performance or preparation for performance. *Restatement (Second) of Contracts,* §§ 347 and 349 (1981). When the evidence fails to substantiate lost profits or "expectation," the correct measure is the cost of work actually performed less any progress payments received. *Restatement of Contracts* § 333 (1932).

The final contract price, as agreed to by Vecco and Century, was $1,659,000.00. In addition, Vecco has billed Century for net change orders of $31,307.09. Century disputes a total of $6,045.76 on two of the change order items. Century's payments to Vecco total $392,743.45.

There is considerable dispute over the percent of the job completed by Vecco prior to termination. Century presented two witnesses on this issue. The first, an employee of one of Vecco's competitors visited the jobsite on March 17, 1979, shortly after Vecco had filed its petition in this Court and six weeks prior to Vecco's termination. This witness testified that Vecco had poured only 642 cubic yards of concrete as of that date. Century's own concrete delivery logs, however, showed that more than

2000 cubic yards had been delivered at that time. The second witness, a Century employee who joined the company after Vecco's departure from The Flour Mill, testified on the basis of a drawing he had made in December 1981, twenty months after Vecco left the job. This witness stated that he had relied upon company records and the recollections of other employees in making the drawing. He admitted that progress photographs taken contemporaneously with Vecco's termination showed substantially more work complete than is indicated on the drawing.

Vecco's president, Mr. Curry, stated that at the time of termination, a few footings remained unfinished; the slab was complete except for a small area awaiting backfill by Century; walls on that level were complete; formwork on the first upper floor was almost complete, with two of the projected seven concrete pours in place and preparation completed for a third; formwork on the second floor was underway. The progress photographs corroborate this testimony. Mr. Curry estimated that 3144 cubic yards of concrete were in place out of a projected total for the job of 12,500.

Century's concrete invoices show that 3572 cubic yards had been delivered as of Vecco's termination date. Century asserts that the total value of Vecco's work on the date of termination was a maximum of $429,000.00. Century's expert witness, however, testified that the per cubic yard cost of placing concrete at the Flour Mill was $197.82. Application of this cost figure to the 3572 cubic yards shown in the invoices yields a value of $706,613.04 for the concrete in place. This figure cannot be a reliable indicator of Vecco's damages, however, because the original contract called for Century to purchase both the actual concrete and the reinforcing steel. These purchases by Century would reduce the cost to Vecco of placing the concrete. Uncontradicted testimony by a witness for Vecco indicates that formwork installed in preparation for placing the concrete accounts for

approximately two-thirds of the overall per cubic yard cost. No value was established for the additional formwork installed by Vecco into which no concrete was poured.

Vecco's final requisition amount, for the total of all work including "extras" was $797,367.49. Century contends that Vecco consistently overbilled for its work. Vecco admits some overbilling of early requisitions but contends that such frontloading of a contract is normal in the concrete industry. Vecco witnesses stated that the practice is necessary to cover mobilization and purchase of supplies used throughout the job and because lower floors, which must be stronger, consume more materials and labor than do the upper floors. Vecco further argues that Century should not be permitted to contest the requisition amounts since it consistently billed the owner at least the requisition amount on Vecco's behalf.

Mr. Curry testified that Vecco's cost to complete the concrete work at The Flour Mill would have been approximately $900,-000.00, based upon the reduced area of the upper floors and the savings realized from repetitive work. Vecco's accountant computed Vecco's lost profits at $46,849.68. Both figures, however, are merely estimates and lack probative value sufficient to sustain a damage award under the rule of section 346(2)(a) of the *Restatement of Contracts* or section 347 of the *Restatement (Second) of Contracts. See also, Restatement (Second of Contracts § 352 (1981); United States v. Community Science Technology, Inc.,* 574 F.2d 1292 (5th Cir.1978).

■ Accordingly, the proper measure of damages is recovery of Vecco's "reliance" interest in the contract, its expenditures made in performance or preparation for performance, less any progress payments received. *Restatement of Contracts §§ 333, 346(2)(b)* (1932); *Restatement (Second) of Contracts § 349* (1981); *Blake Construction Co., Inc. v. C.J. Coakley Co., Inc.,* 431 A.2d 569, 579 (D.C.App.1981).

Vecco's final requisition for $797,367.49 is compromised however by Vecco admitting to some early overbilling, a unknown portion of which may have been justified by such factors as completion of mobilization and extra labor and consumption of materials in the lower part of the building. This requisition, therefore, cannot accurately represent Vecco's actual expenditures at The Flour Mill. In early February 1979, however, the parties had agreed to a trade payment breakdown which assigned specific dollar amounts to the various components of the job. The evidence adduced as a whole supports Vecco's claim that it had completed or nearly completed the first four items on this trade payment breakdown, namely: mobilization, foundations, walls to first floor and slab on grade. The trade payment breakdown assigns a total value to these items of $540,000.00.

The trade payment breakdown provides figures for labor, lumber purchases, equipment, overhead expenses and profit, with a separate assignment of a value to the placing of reinforcing steel. It does not itemize construction of formwork or placing of concrete. Century's records show that at termination Vecco had poured slightly more than one-quarter of the total concrete to be used in the job and had placed almost one-third of the reinforcing steel. By assigning a percentage of completion for the first and second above-ground floors based upon the progress photographs, however, a reasonable value may be ascertained. Based upon fifty per cent completion of the first floor, Vecco may claim an expenditure of $116,-000.00 for that floor. Based upon ten per cent completion of the walls to the second floor and the second floor itself, Vecco properly may claim $25,700.00 for this work. Based upon the agreed trade payment breakdown and the amount of work actually completed, Vecco can substantiate expenditures of $682,200.00 on its contract at The Flour Mill. To this must be added the net change orders which raise the total to $713,507.09. Century paid Vecco $392,-743.45 on a combination of requisitions and direct payments of payroll and suppliers. Accordingly, after crediting Century for

these payments, Vecco is due $320,763.64 on its contract with Century.

In addition, Vecco claims $23,377.50 remains due from Century for Vecco's materials left at the job site and not later returned by Century. The dispute between the parties regarding Vecco's materials was the subject of hearings in this Court in May and June of 1979 following which Vecco apparently recovered most of its materials. The Court finds credible and uncontradicted the evidence presented by Vecco to support its claim for unreturned items. Accordingly, Century is liable to Vecco for this amount in addition to the contract payments stated above.

The Flour Mill is located in the District of Columbia, and thus the law of that jurisdiction controls regarding Vecco's claim for interest from the date of its termination. The award of pre-judgment interest is not favored in the District of Columbia and is not to be allowed unless needed to make the prevailing party whole. *Blake Construction Co., Inc. v. C.J. Coakley Co., Inc.*, 431 A.2d 569, 580 (D.C.App.1981). There has been no showing of such need in this case. Accordingly, no pre-judgment interest will be payable.

An appropriate Order will enter.